UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

—————

DAVID LALL,

                        Petitioner,                    Case No. 1:09-cv-453

v.                                            Honorable Robert Holmes Bell

DAVID BERGH,

                        Respondent.

_____/

## <u>REPORT AND RECOMMENDATION</u>

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254. Petitioner was sentenced to a prison term of four years and eight months to nine years and four months, imposed by the Berrien County Circuit Court on August 7, 2006, after a jury convicted Petitioner of first-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520b. Petitioner was released on parole on April 3, 2012. In his petition, submitted by counsel, Petitioner raises three grounds for relief, as follows:

    I.        PETITIONER'S FEDERAL CONSTITUTIONAL PROTECTION AGAINST DOUBLE JEOPARDY WAS VIOLATED WHEN THE COURT PERMITTED THE PROSECUTION TO TRY PETITIONER ON THE THEORY THAT HE ADMINISTERED A DRUG WITHOUT CONSENT.

    II.      THE DOCTRINE OF COLLATERAL ESTOPPEL PRECLUDED THE PROSECUTION FROM INTRODUCING EVIDENCE THAT [PETITIONER] ADMINISTERED A DRUG WITHOUT CONSENT.

    III.     THE STATE COURT VIOLATED FEDERAL LAW WHEN IT DENIED [PETITIONER]'S MOTION FOR A MISTRIAL BASED ON JURY MISCONDUCT.

(Br. in Supp. of Compl., docket #2, Page ID##14, 19, 23.)  Respondent has filed an answer to the petition (docket #6) arguing that the petition should be denied because it is without merit.  On March 13, 2012, I ordered supplementation of the record to provide the Court with transcripts and other materials related to Petitioner's first trial (docket #31).

Upon review of the record as supplemented, and applying the AEDPA standards, I conclude that Petitioner's second trial on first-degree criminal sexual conduct violated the collateral-estoppel component of the Double Jeopardy Clause.  Accordingly, I recommend that the petition be granted and an absolute writ be issued.  Because Petitioner is now on parole after having served the minimum portion of his sentence for CSC I, I further recommend that he be immediately released from parole or other custody and that his retrial for CSC I be barred.

## Procedural History

### A.    Trial Court Proceedings

The state prosecution arose from allegations that Petitioner, who is a nurse, sexually assaulted an emergency-room patient, Carolee Womack, while she was rendered unconscious by a drug.  Specifically, the prosecution alleged that, after being ordered by a physician to deliver Phenergan to control the patient's nausea, Petitioner instead injected Womack with Valium, causing her to become unconscious.  Petitioner then allegedly pulled down Womack's underwear, kissed her, pressed his penis to her mouth and put his fingers in her vagina.  Petitioner was charged with delivery of a controlled substance (Valium) with the intent to commit criminal sexual conduct,

MICH. COMP. LAWS § 333.7401a, and first-degree criminal sexual conduct (CSC I), MICH. COMP. LAWS § 750.520b.[1]

The first trial began on May 31, 2005 and lasted twelve days.[2]  Carolee Womack testified that, on August 20 to 21, 2004, she worked the 10:00 p.m. to 6:00 a.m. shift as a robotic weld technician and shift leader at Modineer.  (Tr. 1, vol. II at 7-9.)  When she arrived home, she had sexual relations with her husband and then showered and got her two daughters ready to go to wristband day at the Berrien County Youth Fair.  (*Id.* at 9-10.)  She arrived at the fair at about noon or 12:30 p.m., and she and her daughters began going on rides and eating fair food.  (*Id.* at 12.)  She began to feel sick, and she returned to the vehicle.  She thought that she was hypoglycemic. She tried eating cotton candy and drinking a Mountain Dew, but she started to continuously vomit.  (*Id.* at 12-14.)  Her elder daughter called the medics, who came to her van, placed her on a gurney, and wheeled her to an ambulance.  The medics started an IV and gave her saline.  (*Id.* at 14-16.)  She placed a towel over her eyes.  (*Id.* at 15.)  The ambulance took her to Lakeland Hospital in St. Joseph, Michigan, but her daughters stayed at the fair with her sister.  (*Id.* at 16, 19-20.)  Womack arrived at the hospital at about 3:30 p.m., by which time she had not slept in 24 hours.  She was transferred to a hospital gurney and kept in the hallway for some time.  She continued to have a towel over her eyes, and her head was spinning.  (*Id.* at 17-18, 122.)  Womack had no memory of being interviewed by hospital staff while she was in the hallway, except being questioned about

---

[1]Because the details of the evidence are critical to the analysis of Petitioner's collateral-estoppel claim, the trial facts are set forth in significant detail.

[2]In fact, both trials each lasted twelve days.  The first trial took place between May 31, 2005 and June 17, 2005. The second trial was held between June 20, 2006 and July 7, 2006.  Hereafter, the transcripts for the first trial will be cited according to the following format:  Tr. 1, vol. __ at __.  The second trial will be cited similarly:  Tr. 2, vol. __ at __.

health insurance. (*Id.* at 123.) She also did not remember ever having a physical examination. (*Id.* at 129.)

She eventually was moved into a treatment room, and a female and male nurse transferred her from the gurney to a hospital bed. (*Id.* at 18, 21-22, 127.) Womack identified Petitioner as the male nurse. (*Id.* at 23.) The female nurse asked her to remove her shirt and bra and put on a hospital gown. When she did so she felt dizzy and sick. (*Id.* at 24.) According to Womack, her pants, underwear and shoes were still on. Petitioner placed some monitors on her body, under the gown. (*Id.* at 25.) Womack pulled the blanket over her head. (*Id.* at 26.) The doctor came in and someone drew blood at some point, but she did not know in which order. The doctor asked her to take off the blanket so that he could hear her. (*Id.* at 26.) The doctor told her that he believed the problem was not her hypoglycemia, but was low potassium. (*Id.* at 27-28.) The doctor said that he was ordering Phenergan for her nausea. (*Id.* at 28.)

Petitioner subsequently came into the room and told Womack that he had the Phenergan that the doctor had ordered. (*Id.* at 29.) He injected something into the IV, which caused her to feel severe pain in her arm. (*Id.* at 30.) She believed the substance being injected was Phenergan, and she did not consent to the administration of any other drug. (*Id.* at 83.) She fell soundly asleep immediately thereafter and woke to find him French-kissing her. (*Id.* at 31.) She tried to push him away, but she could not keep her eyes open. (*Id.* at 32.) The next time she woke up, Petitioner was pressing his penis against her mouth. (*Id.* at 33.) She saw his pubic area within twelve inches of her face, but he still had his pants on. Womack passed out again. (*Id.* at 34-35.) She recalled waking again when her underwear was being pulled down her backside. (*Id.* at 36.) She pulled her underwear back up, briefly realizing that her pants were gone before falling asleep

again.  (*Id.* at 38.)  The last time she woke, she felt pressure in her vaginal area.  She saw Petitioner standing to her left, with his hand moving in and out of her vagina.  (*Id.* at 40.)  She pulled his hand away and asked what he was doing.  (*Id.*)  He told her that she had asked him to do it.  She did not notice if he was wearing gloves.  (*Id.* at 41.)  Womack told Petitioner to stop.  (*Id.*)  She also testified that, at some point, Petitioner gave a second injection into the IV.  Womack complained that it hurt, and Petitioner told her he was just flushing her IV.  (*Id.* at 44.)  Womack reported that she did not remember the exact sequence of events, but knew that all events had happened.  (*Id.*)  She had remembered different things over time.  (*Id.* at 45.)

After she awoke the last time, Womack was still groggy and tried to figure out what was going on.  (*Id.* at 42.)  She asked for her clothes, and Petitioner retrieved them from under the gurney, where they were neatly folded.  Petitioner assisted her in dressing and asked her why she was so sleepy and what was the matter.  (*Id.* at 43.)  Womack wanted to leave as soon as possible.  She looked around the room to see if anything was out of place.  She thought she saw a blue condom in the trash.  (*Id.* at 45-46.)  Womack used the hospital phone to call a friend, Marco Reyna, to pick her up.  (*Id.* at 48.)  Petitioner had told her that she was not permitted to use her cell phone.  (*Id.* at 50-51.)  Petitioner dialed the number for her.  (*Id.* at 52.)  She asked Petitioner when she could leave, and he told her he had her discharge papers in hand.  (*Id.* at 56.)  Womack left the hospital without talking to anyone else because she was afraid and wanted to leave.  (*Id.* at 57.)  She went out the front of the hospital and positioned herself on the other side of a large sign, where she began crying.  (*Id.* at 57, 65.)  Womack did not recall crying in the emergency room, though she may have told Detective Easton that she did.  (*Id.* at 64-65.)  She then called Reyna several more times and called her sister.  (*Id.* at 57-59.)  Her sister had to leave the fair, so Womack told her sister to give

Womack's children $10.00 each and leave them at the fair. Her sister gave her cell phone to one of Womack's daughters. (*Id.* at 60.) When Reyna arrived, Womack told him to take her to the Berrien County Fair so that she could pick up her van and her children. Her husband called her, but, because she was crying, Womack told him that she could not talk. (*Id.* at 62.) After being dropped at the fairground, Womack drove her daughters home. She then drove the short distance to her husband's workplace. She called and asked him to meet her out back. (*Id.* at 66.) When he arrived, she told him that she had been raped by a nurse. He ran back into the shop to tell them he was leaving.

Womack and her husband immediately drove to St. Joseph Hospital in South Bend. (*Id.* at 67.) There, a nurse conducted an interview and performed a rape examination, including sampling for a rape kit. (*Id.* at 67-69.) Womack acknowledged that she did not tell the nurse or the two police officers she spoke with that Petitioner's penis was pressed against her mouth or that Petitioner had kissed her. She also acknowledged that she told a police officer that she saw Petitioner's penis only when he was getting her clothes. (*Id.* at 84, 162-63.) During the interview, Womack told the nurse that she was taking Vicodin, Darvocet and Flexeril to treat degenerative disc disease in her lower spine. (*Id.* at 74.) At trial, she stated that she had last taken any of those medications several days before the incident. (*Id.* at 76.) A month prior to the incident, she was given one Valium pill as treatment for a vehicle accident, which she took that same day. (*Id.* at 78-79.)

In the days following the incident, Womack developed an infection that spread down her arm. (*Id.* at 71.) She saw a physician, Dr. Delee, who prescribed an antibiotic. When the antibiotic did not work, he increased her dose and gave her a supplemental shot. (*Id.* at 71-72.) She testified that she cried for five days straight and that she continues to have crying episodes regularly.

(*Id.* at 85-87.) She lost sleep, experienced great stress, and was unable to leave the house for most things. Womack could no longer focus sufficiently to perform her dangerous job, and she eventually had to quit. (*Id.* at 87-91.) She sought treatment with a therapist, but she did not return after she lost her insurance. Her attorney referred her to another therapist, whom she saw twice. (*Id.* at 92.) Womack acknowledged that she was pursuing a civil claim against the hospital. (*Id.* at 93, 105-06.) She denied knowing Lena Boyd and Jessica Kelley before the incident. (*Id.* at 93, 105-06.)

Emergency medical technician Michelle Murphy testified that she was working for Medic One Ambulance at 3:00 p.m. on August 21, 2004. (*Id.* at 207.) She and her partner responded to a call from the Berrien County Youth Fair. (*Id.* at 208.) Womack was sick to her stomach and thought her blood sugar was low, but she was alert. (*Id.* at 211-12.) Womack vomited multiple times on the way to the hospital. Murphy started an IV and administered saline solution. (*Id.* at 213.) They arrived at the hospital at 3:47 p.m. Womack was transferred from the ambulance stretcher to a hospital bed, and she was turned over to the care of the hospital nurses. (*Id.* at 214-15.)

Mandy McCrorey was a Lakeland Hospital patient care assistant on August 21, 2004. (*Id.* at 219, 232, 243.) When Womack arrived at 3:50 p.m., the hospital was very busy. (*Id.* at 232.) The paramedics wheeled Womack to the hallway near Treatment Room Eight and transferred her to a hospital bed. (*Id.* at 236.) Womack had a towel over her face. (*Id.* at 241.) McCrorey took a triage report from the paramedics. (*Id.* at 236-37.) She took Womack's vital signs while Womack was in the hallway. (*Id.* at 241.) After she helped place Womack in Room Eight at about 4:15 p.m., McCrorey helped Womack remove her shirt and bra and put on a gown. To protect Womack's privacy, Petitioner held the gown in front of Womack like a curtain. Womack was uncooperative and asked to be left alone. (*Id.* at 242, 244-45; Tr. 1, vol. III at 112-13, 115.) McCrorey then drew

four vials of blood from Womack for a series of standard tests. (Tr. 1, vol. II at 246-47.) McCrorey left the room, just as Petitioner was beginning his initial assessment. (*Id.* at 237-38, 242, 248.) Petitioner recorded that Womack was alert and oriented as to time, place, location and identity. (*Id.* at 249.) McCrorey returned to the room sometime later, because the heart monitor alarm was beeping. She found the electrodes had come off of Womack's skin. (*Id.* at 250.) McCrorey reported that the door was open during Womack's entire stay, though the curtain was closed. (*Id.* at 252.) The hospital records showed that McCrorey sent the blood samples to the lab at 4:25 p.m., Petitioner performed orthostatic blood pressure tests at 5:00 p.m., Petitioner administered Phenergan at 5:10 p.m., and Petitioner noted that Womack denied nausea at 5:30 p.m. Womack was discharged at 6:05 p.m. (*Id.* at 254-56.) At discharge, Womack was given a prescription for Phenergan, which was ordered by Dr. Holbert. (*Id.* at 257.) Both Womack and Petitioner signed the discharge papers. (*Id.* at 258.)

After the jury was dismissed for the day, the defense argued that it should be permitted to introduce evidence concerning Petitioner's reputation for trustworthiness, sexual morality, peacefulness, truthfulness and competence as a nurse, in order to combat the prosecution's suggestion that Petitioner had not given the Phenergan as ordered and had falsified his nursing note. (*Id.* at 264-68.) The prosecutor expressly stated that it would not deny the fact that Phenergan caused drowsiness or that Petitioner gave Womack any Phenergan, as traces of Phenergan were found by the defense expert. (*Id.* at 269-70.) The court ruled that Womack's evidence generally met the conditions for admissibility. The court also reiterated its conditional pre-trial ruling that the testimony of Lena Boyd and Jessica Kelley could be admitted by the prosecutor under Rule 404(b) of the Michigan Rules of Evidence. (*Id.* at 277.) Defense counsel asked for reconsideration on the

ground that Kelley's story had changed, and she did not allege sexual touching until after the Womack incident. The court entertained further argument. (*Id.* at 277-79.) The following morning, the court ruled that the 404b evidence would be admitted. (Tr. 1, vol. III at 5.) The court also concluded that character evidence of trustworthiness, sexual morality, truthfulness and being law-abiding were relevant and admissible, while the other traits were not. (*Id.* at 5-10, 17.)

McCrorey was then questioned about other patient records showing the timing of Petitioner's interactions with four other patients to whom he was assigned at the same time Womack was his patient. The records reflect Petitioner's entries on those records at 3:25, 3:45, 3:50, 3:55, 3:58, 4:05, 4:25, 4:31, 4:30, 4:35, 4:53, 5:30, and 5:40 p.m. (*Id.* at 31-37.) She testified about the lengths of time that various procedures would have taken to perform and about the precision of the noted time. (*Id.* at 39-42.) She testified that nurses did not always make a notation of nursing stops unless there was a change in status or treatment given. (*Id.* at 47-48, 50.) The 4:53 p.m. notation indicated that Petitioner called the hospital floor to inform the floor nurse about a seriously ill, elderly patient being admitted. The call would have required a complete description of the patient's treatment and condition before admission. (*Id.* at 54-55.) The nurse would not order transport of the patient to the floor for at least another 30 minutes. (*Id.* at 55-56.) Transport workers usually take about 15 minutes to arrive. Petitioner would have continued to have the care of the patient for all of that period. (*Id.* at 57.)

Police Officer Chris Sysco testified that he was called by Officer Neubecker at approximately 10:00 p.m. to collect possible evidence from the room Womack had occupied while at Lakeland. (*Id.* at 203.) As asked, Sysco searched the garbage for a blue condom. He found a blue

tourniquet. (*Id.* at 205-06.) James Womack corroborated his wife's history of events following her release from the hospital. (*Id.* at 236-58; Tr. 1, vol. IV at 4-12.)

Andrea Bradford testified as the nurse who interviewed and examined Womack at St. Joseph's Regional Medical Center in South Bend, Indiana. She testified to Womack's emotional state and reported that the history Womack gave her was substantially consistent with Womack's testimony at trial. Bradford also described the collection of evidence, including blood and urine specimens. (Tr. 1, vol. IV at 15-56.) She did not observe that Womack was disoriented or suffering the effects of mind-altering drugs. (*Id.* at 61.) Despite Womack's complaints, she did not observe injury to Womack's arm or finger. (*Id.* at 63.) Bradford did not record in her notes that Petitioner had penetrated Womack's vagina, only that his fingers were on her vagina. Womack did not mention that Petitioner's penis was pressed to Womack's lips. (*Id.* at 68-75.) Physical examination showed no lesions or other abnormalities. (*Id.* at 80.)

Dr. Patrick Holbert testified that he was the doctor who treated Womack in the Lakeland Hospital emergency room. (*Id.* at 84, 88.) Womack's face was covered with the sheet, and Holbert asked her to move it down so that he could hear. (*Id.* at 89.) Holbert took a history, examined her, and ordered a series of laboratory blood tests. (*Id.* at 92-93, 111-12.) He ordered that 12.5 mg of Phenergan be administered intravenously through her IV heplock and that a heart monitor be placed. He also ordered that her orthostatic blood pressure and pulse be taken, measuring changes as she changed position. (*Id.* at 93, 102.) Valium was not ordered. (*Id.* 97.) Holbert was confident that he saw Womack once more before her discharge, probably after the lab results were received, but he had no independent recollection. (*Id.* at 98-102.) He would have done another abdominal examination at that time. (*Id.* at 122.) According to Holbert, he frequently enters a room without

advance notice. (*Id.* at 119.) Phenergan has sedative properties and makes people sleepy. (*Id.* at 120.) Holbert never observed Womack to be under the influence of Valium or other drug, and she was not unconscious. (*Id.* at 124.)

Daniel Gaboury testified that he is a medical technologist who conducted the initial laboratory screening tests on Petitioner's urine and on one of the blood samples taken in the St. Joseph Hospital in South Bend. His laboratory was a stat lab, not a fully accredited analytical laboratory. (*Id.* at 148-54.) He tested for the presence of eight different drugs. The urine test was positive for benzodiazapene, which could be Valium or Librium or another of fifteen drugs. (*Id.* at 165, 179.) His test could not determine the amount of the drug, and it would record a negative for any level lower than a threshold of 200 nanograms. (*Id.* at 166-67.) The blood screening tests were divided in two, one of which tested for aspirin, acetominophen and alcohol, and one that tested for benzodiazapenes, barbiturates and other substances. (*Id.* at 173.) He ran the first test, which was positive only for aspirin. (*Id.* at 174.) The second test was run on the other part of the blood sample by Randy Anderson, who found it negative for benzodiazapenes, with a 300-nanogram threshold. (*Id.* at 174, 189-90, 196-97.)

Fred House is a medical technologist and forensic scientist at the Michigan State Police Lansing Forensic Center. He performed the solid phase extraction (SPE) and gas chromotography/mass spectrometry (GCMS) analysis on one of Womack's blood samples. (*Id.* at 214, 221.) He found a signature fragmentation pattern that indicated the presence of Valium or diazepam. (*Id.* at 230.) He also found a metabolite of diazepam, methyldiazepam or nordiazepam. (*Id.* at 231–32, 238.) He looked for Darvocet, Flexeril and Phenergan, but he did not detect the presence of any of those drugs. (*Id.* at 234.) House testified that he had seen a test report of a

portion of the blood sent to another lab that found Phenergan at a level far below the limits of his ability to detect.  (*Id.* at 240-41.)

The court next heard extended arguments regarding the admissibility of testimony and a chart summarizing the times Petitioner had accessed 10 mg vials Valium on the emergency room Pyxis machine and the times Petitioner failed to properly document his disposal of (or "waste") any amounts that were not administered to the patient for whom the Valium was ordered.  (Tr. 1, vol. V at 3-36.)  The court ruled that the prosecution was entitled to admit evidence of Petitioner's accessing and failure to properly document waste of excess Valium.  However, the court held that the defense could admit evidence concerning the administration and disposal of Valium by other randomly selected nurses.  (*Id.* at 36-37.)

The supervisor of the Michigan State Police Crime Lab, Dr. Michelle Glinn, testified as an expert in biochemistry and toxicology.  (*Id.* at 53.)  Glinn testified that the laboratory was accredited by the American Society of Crime Lab Directors (ASCLD), unlike hospital stat labs and most private laboratories.  (*Id.* at 55-56.)  Glinn testified that Valium (diazepam) is a sedative and tranquilizer.  (*Id.* at 62.)  The speed at which the drug is metabolized depends on many factors, including how quickly an individual's liver processes the drug, and dehydration and lack of sleep can affect the impact.  (*Id.* at 65.)  She reviewed Fred House's GCMS test results, together with the raw data.  (*Id.* at 69.)  She also calculated the ratio of peak from Womack's test to the internal standard for a known quantity of Valium.  She subsequently created a ratio between the amount of diazepam per milliliter and nordiazepam (the major metabolite) per milliliter.  (*Id.* at 75.)  The ratio was 82 nanograms per milliliter of diazepam to 25 nanograms of nordiazepam per milliliter, or a little over three to one.  (*Id.* at 75-76, 85.)  From the amounts and ratio, Glinn estimated that the

- 12 -

amount of the dose given was probably 10 mg or less.  She could not tell if it was given orally or intravenously, but the ratio was within the range that could be consistent with having been administered intravenously six hours before the sample was taken.  (*Id.* at 83-84, 88.)  It could have been taken between two and twelve hours before.  (*Id.* at 84.)  The half-life of diazepam is 20 to 50 hours.  (*Id.* at 146.)  The half–life of nordiazepam is up to 100 hours.  (*Id.*)  Drugs typically will be more concentrated in the urine than the blood, and it was not inconsistent to have a stat lab result of positive in the urine and negative in the blood.  Similarly, because of the different sensitivities of the test, there was no inconsistency between the negative stat blood result and the positive blood result at her lab.  (*Id.* at 90-92.)  Phenergan or promethazine also is a sedative.  (*Id.* at 93.)  The two drugs together could have additive effects.  (*Id.* at 94.)  Glinn testified that one-third of the drug cases she sees involve Valium, as it is very available, both through prescription and on the street.  (*Id.* at 100.)  Promethazine is not found very often.  (*Id.* at 125.)  She is confident that House's test was properly done, but other instrumentation could have found something that was not detectable by the state police crime lab.  (*Id.* at 125.)

Mark Paulson testified as the pharmacy director at Lakeland Hospital.  (*Id.* at 159.)  He discussed the use of the Pyxis machine to dispense pharmaceuticals.  Pyxis is a computerized dispensing system, password protected, that allows drugs to be dispensed quickly at various stations and provides proper controls, record-keeping and billing.  (*Id.* at 161-71.)  If a controlled substance is dispensed in a unit greater than the quantity ordered by the doctor, the nurse can go back into the system, with a nurse witness, and waste the overage.  (*Id.* at 165-66.)  Hospital policy requires that a second nurse witness the waste of excess controlled medications.  (*Id.* at 172.)  Paulson retrieved Petitioner's records for accessing and wasting Valium over the prior two years.  (*Id.* at 174-185.)

Petitioner removed 10-mg units of Valium from Pyxis fourteen times, used it all on four of those occasions, and failed to document waste of the overage on all of the remaining occasions, resulting in a total 67.5 mg of Valium unaccounted for. (*Id.*) Paulson acknowledged that there had never been an allegation that Petitioner had misused or taken any drug. (*Id.* at 192.) Phenergan is known to be irritating on injection. (*Id.* at 207.) Phenergan is sometimes given to sedate patients, and it can impair mental and physical ability. (*Id.* at 214-15.) Phenergan can cause severe chemical irritation and damage to tissues. (*Id.* at 216.) Paulson acknowledged that individual passwords were not always kept confidential. (*Id.* at 242.) He also acknowledged that, as the result of Petitioner's case, he and others at the hospital had become aware of widespread failure of emergency-room nurses to properly waste excess Valium. (*Id.* at 247-48) Paulson testified that he randomly looked at four other nurses, at the request of the defense. Those nurses also failed to properly waste drugs, but not as frequently as Petitioner. (*Id.* at 260-66.)

Ann Hunt is a medical technologist who works in the Michigan State Police Department of Forensic Science. She testified as an expert in DNA analysis. (*Id.* at 222, 224.) She performed the DNA analysis on the oral and vaginal samples taken from Womack at St. Joseph Hospital. Her analysis found that the samples contained DNA only from Womack and her husband. (*Id.* at 233-36.) Hunt testified that she would not have expected to pick up epithelial (skin) cells from any digital penetration. (*Id.* at 237.) Hunt was never asked to test for the presence of Petitioner's DNA or to test scrapings from Petitioner's hands. (*Id.* at 237-39.)

Detective Dale Easton testified that, in his interview with her four days after the incident, Womack described her memories substantially consistently with her trial testimony. (Tr. I, vol. VI at 51-52.) Forensic scientist Sarah Thibault testified that she received and reviewed the

evidence in the rape kit and performed preliminary testing that showed positive for the presence of seminal fluid on the vaginal swabs and negative on all other samples. (*Id.* at 57-58.) She was not asked to and did not test the vaginal swabs for foreign epithelial cells. (*Id.* at 66.)

The prosecutor then introduced the testimony of Jessica Kelley and Lena Boyd for the purpose of showing a common scheme or plan. The jury was instructed about the limited use of the testimony. (*Id.* at 71, 191.) Kelley testified that she had chronic headaches resulting from automobile accidents and went to hospital emergency rooms multiple times each month. She went to Lakeland Hospital alone on September 20, 2003, for treatment of a severe headache. (*Id.* at 71-72.) Once Kelley went into her room, Petitioner instructed her to remove everything but her panties and change into a gown. (*Id.* at 73.) Petitioner returned later with the doctor, who examined Kelley. (*Id.* at 74.) Petitioner left the room again and returned to start an IV. After it was started, Petitioner pulled out a syringe, telling Kelley he was injecting saline into the heplock. He told her he would return with the rest of the medications ordered by the doctor. She fell asleep and did not remember him returning. (*Id.* at 75-76.) Kelley awoke sometime later and was still groggy. Her gown and the blankets were pulled down and her breast was exposed. (*Id.* at 77.) Petitioner was in the room with her and the curtain was closed. After she straightened her gown and blankets, Petitioner reached under her gown and blankets and began patting her abdomen and eventually her breasts, as if he was conducting an examination. (*Id.* at 79.) Petitioner commented that she had beautiful breasts. (*Id.* at 80.) She fell back asleep until Petitioner came in to wake her up and tell her they were going to get her out of there. She was having difficulty putting them on, so Petitioner said, "Here, let me help you." (*Id.* at 81.) Petitioner told her she had a nice thong and asked how often she shaved "down there." (*Id.*) Kelley told him her head was still hurting, and she fell back asleep. A female nurse

took over at 7:25 p.m.  Kelley acknowledges that, at some point, she answered the new nurse's questions about her pain, but she did not fully awake until three hours after the female nurse had taken over.  (*Id.* at 82-85, 117, 120-21.)  At that time, just before her discharge at 10:20 p.m., Kelley told the nurse that Petitioner had made her uncomfortable.  The nurse called the charge nurse.  Kelley was groggy, and she told them only about an abdominal examination, during which Petitioner patted her breast area, which she didn't think was necessary.  (*Id.* at 82-85, 126.)  Later that night, Kelley's brother picked her up, stopped at the pharmacy, and dropped her at the police station, where Kelley filed a complaint.  Kelley testified that she did not fully collect her thoughts until the next day.  (*Id.* at 82-85.)  Kelley claimed that the police officer's report was inaccurate in reporting that she had denied that Petitioner had fondled, rubbed or squeezed her breast.  (*Id.* at 88.)  She returned to the hospital the following day, again for a headache.  (*Id.* at 90.)  Kelley talked to an attorney because she was upset that Lakeland Hospital never called her after her complaint.  (*Id.* at 91.)  During her emergency room treatment, Kelley was administered drugs on four occasions:  one injection of 25 mg of Phenergan, two injections of Stadol, and one injection of Dilaudid.  She also was given oral Vicodin and had taken Fiorset before coming to the hospital.  (*Id.* at 133-36.)  According to Kelley, she had been made sleepy but never knocked out by Phenergan, Stadol, Dilaudid or other drugs in her past treatments.  (*Id.* at 92, 96.)  She had, however, had a similar reaction on the two prior occasions on which she received Valium.  (*Id.* at 93-94.)  After Womack filed her complaint a year-and-a-half later and after articles had appeared in the paper, Detective Easton re-interviewed Kelley, at which time she reported for the first time that she had been rendered "unconscious" by drugs administered by Petitioner, though she testified that she did not distinguish that word from her earlier reports of grogginess or sleepiness.  (*Id.* at 144-46.)

Lena Boyd testified that on July 11, 2004, she went alone to the emergency room with a yeast infection. (*Id.* at 187, 214-15.) After she got into a room, Petitioner gave her a gown and instructed her to undress. He then left the room. (*Id.* at 192.) She fully undressed and then lay down with the gown tucked around her, untied. Petitioner returned and told her that the doctor would be with her shortly. (*Id.*) The doctor performed an examination, and she reported that she had pain in response to pressure on her lower right side. (*Id.* at 193, 210-12, 219.) The doctor did not perform a pelvic examination at that time, but she remembers receiving a pelvic examination at some point. (*Id.* at 193, 210-12.) Petitioner then returned and inserted an IV. He told Boyd something about pain medication before withdrawing a blood sample. He then put something in her IV, which he told her was saline. She told him that it was not saline and then fell unconscious. (*Id.* at 194-96.) She awoke to find one breast exposed and hearing Petitioner's comment that she had nice breasts. (*Id.* at 196.) She woke a second time to find Petitioner's fingers moving inside her vagina in a manner that was aggravating. (*Id.* at 197, 223.) She asked what Petitioner was doing, and he stated, "What, your boyfriend doesn't do that to you." (*Id.* at 198.) Boyd testified that she wanted to move but could not. (*Id.*) Petitioner left the room, telling her that he was going off shift. When a new female nurse came in, Boyd told her that she did not want Petitioner near her because he had been inappropriate. Boyd stated that she wanted to go home, but the nurse told her to wait thirty minutes until the antibiotic had run through. (*Id.* at 199-200.) At one point, the experience seemed like a dream. (*Id.* at 223.) Both the doctor and the charge nurse came back into the room, and she told them that Petitioner had been very inappropriate. (*Id.* at 200-01.) She did not tell staff members that she had been drugged or unconscious. (*Id.* at 216.) She did not report to the police at that time. (*Id.* at 202.) After Womack made her allegations, a supervising nurse called Boyd from the hospital.

(*Id.* at 203.) She spoke with Detective Easton and then called an attorney to represent her. (*Id.* at 205.)

Lakeland nurse Michelle Street testified that, on July 11, 2004 at 11:00 p.m., she took over the care of Lena Boyd from Petitioner. She went into the room for the first time at 11:15 p.m. (*Id.* at 238-40.) When she walked in, Boyd was sitting up in bed and had tears in her eyes. Boyd reported that Petitioner had made her feel uncomfortable and had done inappropriate things. (*Id.* at 242.) Streeter noted that the record reflected that Boyd was tearful when she was first admitted. (*Id.* at 258.) According to Street, Boyd told her that, when Petitioner was starting Boyd's IV, Boyd asked what could have caused the pain she felt during the doctor's examination. Petitioner wanted to reassess and began pushing on her abdomen. Boyd told Streeter that Petitioner had put his fingers in her vaginal area, while telling Boyd that he was assessing her. (*Id.* at 243-44.) Boyd told Streeter that she was afraid of telling her husband. (*Id.* at 268.) Streeter got the charge nurse, but she did not stay during Boyd's interview with the charge nurse. Later, Streeter was present when the doctor came in. Boyd did not tell the doctor about her allegations. (*Id.* at 244-45.) Dr. Prince ordered Rocephin and Zithromax, which Steeter administered by injection. (*Id.* at 246.) According to Streeter, saline is typically used to flush the line after an IV is started. (*Id.* at 250.) Streeter also described the Pyxis system, and she reported that it was not unusual for nurses to carry medication vials in their pockets. (*Id.* at 251-53.) According to Streeter, Boyd never appeared to be drugged. (*Id.* at 270.)

Dr. Christopher Prince testified as an expert in emergency room medicine. (Tr. 1. vol. VII at 29.) On July 11, 2004, he treated Lena Boyd in the emergency room. (*Id.* at 30.) At 10:08 p.m., he saw her for the first time and took a history. He did not note any obvious drug or alcohol

intoxication. (*Id.* at 33-34.) Based on her symptoms, Prince informed the nurses that he needed to perform a pelvic examination, and he performed the exam at 11:52 p.m. (*Id.* at 34, 36.) He did not note the influence of any drug. (*Id.* at 36.) He diagnosed a yeast infection with cervical motion tenderness. (*Id.* at 39-40.) At approximately 1:00 a.m., he returned to Boyd's room because the charge nurse and treating nurse told him that Boyd had made an allegation about Petitioner. (*Id.* at 36-37.) He found her in the same position he had found her before, sitting Indian-style on the table. He observed no change in her demeanor and she did not appear to be emotional. (*Id.* at 37.) She told him that Petitioner had touched her vaginal region and inserted a finger. (*Id.* at 49.) She never told him she thought she had been drugged, or he would have performed a drug screen. (*Id.* at 42.) Prince testified that he believed Petitioner to be trustworthy and unwilling to exploit others. (*Id.* at 46.) Prince testified that a person receiving Valium would slowly come out from under the influence, not come awake and lose consciousness repeatedly. (*Id.* at 42, 53-56.) The person could still be responsive during the sedation period, but probably would not remember anything afterward. (*Id.* at 56-57.) According to Prince, when medical professionals want to achieve an amnestic effect, Versed is more commonly used than Valium because it wears off more quickly. (*Id.* at 57.)

Dr. Edward Barbieri testified as a pharmacologist and forensic toxicologist for National Medical Services (NMS). (*Id.* at 65-67.) NMS performed testing on the remaining 1.7 ml of blood taken from Womack and forwarded by the Michigan State Police Laboratory in Lansing. (*Id.* at 70.) They tested for the presence of promethazine, or Phenergan. (*Id.* at 70.) Because of the small size of the sample, they ran a micro-volume gas chromatography test that showed the seven nanograms of promethazine per milliliter. (*Id.* at 74.) He opined that the level was representative of the amount he would expect from an individual injected with 12.5 ml of promethazine five to six

hours before the blood sample was drawn. (*Id.* at 75.) A person administered enough Valium to render the person unconscious could be expected to be unconscious for between one-half hour and four hours, depending on dose, size of patient, other drugs, and other circumstances. (*Id.* at 76.) They did not perform a mass spectrometry test because it was not requested. Also, mass spectrometry was not accurate at the low levels they found. (*Id.* at 80.) Gas chromatography is the most validated method for detecting promethazine and the only way to quantify it. (*Id.* at 94.)

      Officer Steve Neubecker testified that he took Womack's initial report. He confirmed that Womack's original allegations matched her trial testimony, except Womack did not appear to be emotionally upset and did not tell him that Petitioner's penis was pressed against her mouth. (*Id.* at 101-04.) Officer Michael Mendus testified that when Jessica Kelly reported her incident, she told him that Petitioner did not actually touch her breasts. (*Id.* at 111.) She did report nodding off from drugs and that Petitioner made comments concerning her breasts, thong and shaving habits. (*Id.* at 116-18.) Andrews University professor and dean Clifford Jones testified that Petitioner's character was impeccable as to issues of his sexual morality, law-abiding nature, truthfulness and unwillingness to exploit others. (*Id.* at 136-39.) Andrews University biology professor Gordon Atkins testified that, in his opinion, Petitioner was not a truthful person. (Tr. 1, vol. X at 43-44.)

      Nurse-tech Teresa Spitler testified that she worked with Petitioner nearly 60 hours each week. (Tr. 1, vol. VII at 153-54, 163.) She witnessed Phenergan being administered to a patient over one hundred times, as it is prescribed to nearly half of the emergency-room patients. (*Id.* at 154-56.) Patients typically experienced initial intense pain during the administration of Phenergan, which sometimes caused patients to cry. (*Id.* at 156.) She had never witnessed the administration of Valium, because it was not frequently prescribed in the emergency room. (*Id.* at

157.) Spitler also testified that emergency-room nurses frequently did not waste narcotics according to protocol. (*Id.* at 160.) During the week before trial, there had been a new push to reeducate nurses about wasting drugs properly. (*Id.* at 158.) She also testified that patients commonly complained about a lack of privacy because conversations can be overheard and nurses, technicians and doctors frequently walk in and out of rooms unannounced. (*Id.* at 160-61.)

Nurse Roseann Goehring, formerly Roseann (Annie) Bell, testified that she worked at Lakeland Hospital from 7:00 p.m on September 20, 2003 until 7:00 a.m. September 21, 2003. (Tr. 1, vol. VIII at 42-44.) She took over patient care of Jessica Kelley from Petitioner. (*Id.* at 45.) She first saw Kelley at 7:25 p.m. Kelley was sleeping, but awoke and complained of a pain level of five out of ten. (*Id.* at 46-47.) Goerhing advised Dr. Hunt, and, at 8:05 p.m., Goehring administered two mg of Dilaudid. (*Id.* at 49- 50.) At 8:45 p.m., Vicki Radeski noted that Kelley felt better and needed to call for a ride. Goehring received a call from Kelley's mother and found Kelley was very sleepy after the Dilaudid. (*Id.* at 51.) Kelley was discharged at 10:20 p.m., in the care of her brother. (*Id.* at 47.) Shortly before discharge, Kelley complained that Petitioner had taken an unusually long time to examine her abdomen. Kelley did not complain about Petitioner touching her breasts. (*Id.* at 49, 54-55.) Kelley told Goehring that Petitioner came in to find that Kelley's breast was exposed, and he told her to cover it up, which she did. Kelley told Goerhing that she was medicated and out of it and could not be sure whether things had happened or not, but she thought she remembered Petitioner saying that she had nice breasts. (*Id.* at 61-62, 68.) Kelley continued to complain that she was uncomfortable with Petitioner's abdominal examination, so Goehring summoned the charge nurse. (*Id.* at 49, 54-55.) Kelley was never unconscious and was more sleepy at 10:00 p.m. than 7:25 p.m., consistent with the medications she had taken. (*Id.* at 55-57, 91.) Goehring corroborated

the testimony of other witnesses that a nurse working with a patient in the emergency room has no expectation of privacy, as people such as radiology technicians, doctors, respiratory therapists, and other nurses come in and out of patient rooms all the time.  (*Id.* at 64-65.)

Nurse Thais Hill testified that she had worked at Lakeland Hospital for her entire 14-year career.  According to Hill, despite the policy on documenting waste, emergency-room nurses frequently did not waste excess medication immediately, to avoid charging the patient twice if the doctor orders additional medication later.  Frequently, nurses forget they have the medication.  She herself fails to document waste at least twice per week, either because she forgets or because another nurse is not available.  (*Id.* at 101-03.)  Licensed Practical Nurse Joshua Tjader testified that patient gowns frequently come untied.  (*Id.* at 114-15.)

Nurse Catherine Thomas was the charge nurse on the night Carolee Womack was admitted at Lakeland.  (*Id.* at 116.)  The emergency room on August 21, 2004 was very busy, and by about 2:00 p.m., patients were having to wait in the hallway for a room.  (*Id.* at 118.)  Thomas corroborated the testimony that a patient awaiting admission typically would stay in the emergency room for 30 minutes to two hours after the decision to admit, due to the need to prepare the floor staff and get the room ready.  (*Id.* at 120-22.)  That day, due to the number of admissions, the emergency room was having difficulty finding an available bed.  (*Id.* at 123.)  Petitioner would have remained in charge of his admitted patient until moved to the hospital floor.  (*Id.* at 122.)  That afternoon, Petitioner had three patient admissions after 3:00 p.m.  (*Id.* at 128.)  Thomas also recalled that Womack had four or five people with her while she was in the hall of the emergency room, and Thomas had to ask them to go to the waiting room.  (*Id.* at 125.)  Thomas testified that Phenergan injections burned, but she had never had a patient complain about Valium burning.  (*Id.* at 130.)

Thomas had witnessed patients who behaved oddly, and one who experienced hallucinations, after being administered Phenergan. (*Id.* at 131.) According to Thomas, Dr. Kraff, although scheduled to go off shift at 3:00 p.m., was still treating patients at 4:20 p.m. (*Id.* at 150.) Because Dr. Kraff required all patients to disrobe to their underpants, Thomas would have had patients fully disrobe if Dr. Kraff was still in the emergency room. (*Id.* at 153.) She never heard Womack in distress, saw Petitioner acting in an unusual manner, or noticed him missing in the emergency area. (*Id.* at 161-62.)

Petitioner's wife, Allison Williams, testified that she measured Petitioner when he was wearing his work shoes to be at 5' 8½ " tall. She measured the distance from Petitioner's groin to floor at 32½". She testified that Petitioner had an uncircumcised penis. (*Id.* at 203-04.) Dr. Robert Stephen confirmed that. (Tr. 1, vol. IX at 8.)

Nurse Lori Allen worked with Petitioner on the day of Womack's hospital visit. Womack had her head covered the whole time. Allen saw at least five women standing around Womack while she was in the hallway awaiting a room. (*Id.* at 57.) Allen asked the people to leave in order to clear the hallway. (*Id.* at 58.) Allen reiterated that people entered through the curtain of rooms frequently, getting equipment or supplies or performing other tasks. (*Id.* at 60.) Allen also reiterated that she did not notice that Petitioner was missing at any time, and a nurse who was gone or with a patient too long usually would be noticed. (*Id.* at 62.) Allen also testified that it is almost impossible for one nurse to remove jeans without the assistance of the patient or another nurse. (*Id.* at 63.) Allen and other emergency-room nurses frequently did not waste medication according to Pyxis protocol for a variety of treatment and logistical reasons. (*Id.* at 66-68.) Allen also measured Petitioner in shoes with one-inch heels at 5' 8½" in height and 31½" from groin to floor. The

emergency room had three types of beds ranging in height at their lowest settings from 26½" for a gynecological exam bed and 27½" to 33" for a standard bed. Most standard beds were 31". (*Id.* at 75-79, 86-87.) The type of bed she saw Womack on was a standard bed, not a gynecological bed. (*Id.* at 87.)

Nurse John Elsner was hired as the Lakeland emergency-room, patient-care manager after Petitioner no longer worked at the hospital. (*Id.* at 91.) Elsner testified that he had examined the patient records of a total of eight randomly selected emergency-room nurses to see how they wasted Valium over the two-year period from January 2003 to January 2005. (*Id.* at 91-92.) Nurse A had pulled Valium seven times, should have documented waste six times, and failed to waste properly 100% of those times. (*Id.* at 94-96.) Nurse B failed to waste properly four of five times, or approximately 80% of the time. (*Id.* at 97.) Nurse C failed to waste properly in 60% of cases. (*Id.* at 99.) Nurse D failed to waste properly on at least one of three occasions. (*Id.* at 100.) Of the other four nurses, Nurse One wasted properly on six of six occasions. Nurse Two Wasted improperly five of fourteen times. Nurse Three wasted improperly on one of four occasions. And Nurse Four failed to waste properly three of eight times. (*Id.* at 115-16.)

Dr. John Lehmann testified as an expert in pharmocology. (*Id.* at 133-35.) Lehmann stated that stat lab results usually cannot detect small amounts of drugs. They have high error rates: 20% false negative results and 10% false positive results. (*Id.* at 135-36.) Lehman testified that he had examined Womack's blood testing performed by the Michigan State Police Forensic Laboratory. The reported ratio of 82 nanograms per milliliter of diazepam to 25 nanograms per milliliter of nordiazepam, approximately 3.2 to 1, was wholly inconsistent with intravenous dosing five hours prior to testing. (*Id.* at 137-43, 147-148, 160.) It could, however be consistent with oral dosing

during that time frame or intravenous administration eight to twelve hours earlier. (*Id.* at 144-46, 151.) Although Valium is dissolved in alcohol, the alcohol concentration is low, and the substance does not cause burning on injection. (*Id.* at 154.) Hallucinations are a known side-effect of the administration of therapeutic doses of Phenergan, occurring in more than 2% of cases. (*Id.* at 160-61.)

During closing argument, the prosecutor reiterated that the entire case was based on the theory that Petitioner planned to and did stockpile Valium with the purpose of delivering it to Womack and other women; he did deliver it to Womack under the guise of treatment; his purpose was to commit sexual assault; and he did sexually assault Womack.

On the morning of June 16, 2005, the jury was instructed on both charges. The court instructed the jury that, in order to prove CSC I, the prosecutor must show that Petitioner sexually penetrated Womack under one of three other sets of circumstances: (1) the offense was committed during the commission of a felony (in this case, the crime of delivery of a controlled substance with the intent to commit first-degree criminal sexual conduct); (2) the defendant caused personal injury to Carolee Womack and force or coercion was used to accomplish the sexual penetration; or (3) the defendant caused personal injury to Womack while Womack was mentally incapacitated or physically helpless. In order to show mental incapacitation, Womack must have been temporarily unable to understand or control what she was doing because of a narcotic, anesthetic, or other substance administered without her consent. (Tr. 1, vol. XI at 23-28.) The court instructed that, to prove that Petitioner delivered a controlled substance with the intent to commit criminal sexual conduct, the prosecutor was required to prove four elements: (1) Petitioner knowingly delivered a controlled substance to Womack; (2) the controlled substance was Valium; (3) Petitioner did not

have Womack's consent to deliver Valium; and (4) Petitioner delivered the Valium with the specific intent to engage or attempt to engage in CSC I. In describing the fourth element, the court reiterated the elements of CSC I under all of the three theories of that offense. (*Id.* at 28-30.)

The jury began to deliberate at 9:37 a.m. on June 16, 2005. (*Id.* at 34.) The jury sent two questions to the court, which were discussed with the attorneys. (*Id.* at 38-40, 41-43.) At 4:05 p.m., the jury sent a message saying, "[T]he jury is having a hard time agreeing on a verdict. We are at a standstill. What happens from here[?]" (*Id.* at 43.) After discussion, the court released the jury for the day, telling them to go home and come back the next day to see if they could make progress. (*Id.* at 44.) The jury returned the following day at 8:30 a.m. and deliberated until 11:16 a.m., when it sent another note saying, "We the jurors[] have made every reasonable effort to reach an agreement. We have expressed our opinions, reasons for them, kept an open mind, not hesitating to work out our differences, however, some of us are not willing to give up our honest opinions about this case just because verdict [sic]. The verdict in this criminal case is unanimous on one of the two counts and undecided on the other." (Tr. 1, vol. XII at 3.) After further inquiry of the jury, the court accepted the jury's verdict on count two, that Petitioner was not guilty of the offense of delivery of a controlled substance (Valium) with the intent to commit criminal sexual conduct. The court declared a mistrial on count one, first-degree criminal sexual conduct. (*Id.* at 7-8, 11.)

Petitioner thereafter moved for dismissal of the CSC I charge on the basis of double jeopardy. In the alternative, Petitioner moved to suppress of all evidence related to the delivery of Valium on the grounds of collateral estoppel. After extensive briefing, the trial court ruled that the Double Jeopardy Clause of the Fifth Amendment prohibited the People from re-trying Petitioner on the CSC I count under the theory that he committed an act of sexual assault with penetration in

conjunction with a felony, with the predicate felony being delivery of a controlled substance under MICH. COMP. LAWS § 333.7401(a). The court concluded, however, that the Double Jeopardy Clause did not prohibit the prosecution from trying Plaintiff under the alternate theories of CSC I: sexual penetration involving physical injury involving the use of force or coercion, MICH. COMP. LAWS § 750.520b(1)(f), and sexual penetration involving physical injury of a person who was mentally incapacitated or physically helpless, MICH. COMP. LAWS § 750.520b(1)(d). On the issue of collateral estoppel, the court held that a review of the record of the prior proceeding (over which he had presided), "taking into account the pleadings, evidence, charge, and other relevant matter . . ." left no reasonable doubt that the jury's decision was based on a finding that Petitioner had not injected Valium into Womack. (5/30/06 Cir. Ct. Op. & Ord at 5-6, docket #22.) The trial court ruled, however, that the collateral-estoppel test did not bar the prosecution from introducing evidence that Petitioner had delivered Valium to Womack because the delivery of Valium was not an element of CSC I under the two remaining theories. (*Id.* at 12-13.)

Petitioner filed an application for interlocutory appeal, together with a motion for immediate consideration and a motion to stay the trial-court proceedings. In an order issued June 16, 2006, the Michigan Court of Appeals granted the motion for immediate consideration, denied the application for leave to appeal for lack of need for immediate appellate review, and denied the motion to stay the proceedings as moot. (6/16/2006 Mich. Ct. App. (MCOA) Ord., docket #22.)

During the second trial, the prosecution was based almost entirely on the theory that the case was "about the sexual fantasies of the defendant, David Lall, and the calculated steps he took to make those fantasies a reality." (Tr. 2, vol. II, at 183.) The prosecutor then described the process as follows:

The evidence will show that David Lall's sexual fantasies revolved around a white female, mid-20's to early 30's in age, approximately five foot two to five foot six, weighing between 125 and 140 pounds. She's tan. She's got shoulder length, blond hair. She's got painted toenails, pierced ears, pierced belly button, tattoo on her back, and she shaves her pubic hair.

In each of the defendant's fantasies, a woman comes into the emergency room where the defendant works as a nurse. She comes by herself, no family or friends accompany her. She is ushered into an examination room where she's told to take off most of her clothing, and put on a loose fitting hospital gown with ties in the back.

The defendant walks in, performs an initial physical assessment on her. He has a stethoscope, and he touches her chest, and he takes his fingers and he presses her lower abdomen.

The doctor comes in, examines the woman, and orders that the defendant administer medication to her.

Once the doctor leaves the room, the defendant is alone with a woman. She's vulnerable, of course, and she's trusting. And they're alone behind the curtain. And the defendant is aching to touch her again in other ways. But he can't ask. He won't ask permission. Instead, he injects her with a medication, a medication that wasn't ordered by the doctor, and the woman loses consciousness. And they're alone, the two of them, in a room, behind a curtain. The defendant begins to touch her not as a nurse, but as an intimate partner.

Outrageous? Unbelievable? You bet.

Yes, the evidence will show you that the defendant fulfilled that fantasy not once, not twice, but three times.

Three women will come into court and testify, Jessica Kelley, Lena Boyd, and Carolee Womack, that they came into the emergency room at Lakeland Hospital alone, Jessica in September of 2003, Lena in July of 2004, and Carolee in August of 2004.

. . .

They will tell you that they went into the hospital alone, that they were ushered into a room where they took off most of their clothing and put on a loose fitting hospital gown. They will tell you that the defendant came in and performed an initial physical assessment on them, and then later, after the doctor left, the

defendant injected them with a substance under the guise of medical treatment that made them go to sleep. And at some later point, each of these women will tell you that they woke up to find the defendant assaulting them sexually.

(Tr. 2, vol. II, at 184-85.) The prosecutor then proceeded to introduce testimony at trial that Petitioner had a common scheme or plan to deliver Valium to three women without their consent in order to commit first-degree criminal sexual conduct. The testimony in the second trial was largely consistent with that of the first trial, except that additional witnesses were brought to reinforce the similarities between the women's situations and physical appearances, to corroborate Womack's testimony that she was alone at the emergency room, and to prove that Petitioner had failed to properly waste Valium. (Tr. 2, vol. II-IX.)

In his closing argument, the prosecutor argued that Petitioner had intentionally selected a series of similar-looking women, injected them with a drug under the guise of medical treatment, and, when they fell asleep, sexually assaulted them by touching their breasts and genitalia. (Tr. 2, vol IX at 2031-32, docket #17.) All three awoke to traumatic events, and all three had difficulty remembering exact details about what had happened, consistent with having been administered Valium. (*Id.* at 2032-33.) The prosecutor focused his argument on Petitioner's giving of injections to all three, mentioning saline during the injections, having access to Valium, having knowledge of the effects of Valium, and having improperly wasted Valium under hospital protocols. (*Id.* at 2037.) He specifically argued that Womack was mentally incapacitated because of Valium injected without her consent. In the alternative, the prosecutor argued that, if the jury chose to believe that Petitioner did not inject the Valium, she was physically helpless from the effects of Phenergan. (*Id.* at 2042.)

The court instructed the jury about the elements of CSC I under two theories: (1) that Petitioner committed a sexual penetration causing personal injury using force or coercion; and (2) that Petitioner committed a sexual penetration causing personal injury while Womack was mentally incapacitated or physically helpless. (*Id.* at 2116-17.)

A variety of juror communications occurred during the four days of deliberations. A more specific discussion of those communications is set forth under part III of the Discussion section, *infra*. Shortly before the end of the third day of deliberations, the jury sent a message saying, "Judge, we are not able to reach a unanimous verdict." (Tr. 2, vol. XI at 2192.) Defense counsel moved to declare a hung jury and grant a mistrial. (*Id.*) The court, however, concluded that a hung-jury instruction should be read. (*Id.* at 2193.) After the court gave the instruction, it dismissed the jury for the evening. (*Id.* at 2195.) The jury resumed deliberations the morning of July 7, 2006 and returned a guilty verdict at 1:30 p.m. (Tr. 2, vol. XII at 2138, docket #20.)

On August 7, 2006, Petitioner was sentenced to imprisonment for 56 to 112 months. (Tr. 2, vol. XII at 35, docket #21.)

## B.     Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on June 19, 2007, raised four issues, including the three raised in this application for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, docket #24.)   By unpublished opinion issued on June 19, 2008, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences. (*See* 6/19/08 Mich. Ct. App. Opinion (MCOA Op.), docket #24.)  Petitioner sought reconsideration, which was denied on July 30, 2007. (7/30/08 MCOA Ord., docket #24.)

Petitioner, through counsel, filed an application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same four claims presented to and rejected by the Michigan Court of Appeals. By order entered January 9, 2009, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., docket #27.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination

of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001); *see also Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial

court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

**Discussion**

I.     Double Jeopardy – Successive Prosecution

Before the second trial, the court ruled that, under the successive prosecution component of the Double Jeopardy Clause, Petitioner could not be retried for CSC I on the theory that he had committed a sexual assault involving penetration while he committed the felony of delivery of a controlled substance with the intent to commit CSC I. The court, however, held that the Double Jeopardy Clause did not bar retrial of the CSC I charge under the theory that Petitioner used force or coercion or the theory that Petitioner committed the act when Womack was mentally incapacitated or physically helpless.

In his first habeas ground, Petitioner contends that, because he previously was acquitted of delivering a drug with the intent to commit criminal sexual conduct, the successive prosecution component of the Double Jeopardy Clause was violated when the prosecution was permitted to try him for first-degree criminal sexual conduct on the theory that the victim was mentally incapacitated after being administered a drug without her consent. Petitioner does not dispute that the prosecution was permitted to try him for first-degree criminal sexual conduct on the theory that he used force or violence or that he committed the offense while the victim was physically helpless.

The Double Jeopardy Clause guarantees that no person shall be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. CONST. amend. V. This clause provides three separate guarantees: (1) it protects against a second prosecution for the same offense after

acquittal; (2) it protects against a second prosecution for the same offense after conviction; and (3) it protects against multiple punishments for the same offense. *See North United States v. Dixon*, 509 U.S. 688, 696 (1993); *Illinois v. Vitale*, 447 U.S. 410, 415 (1980); *North Carolina v. Pearce*, 395 U.S. 711, 717 (1969).

In *Brown v. Ohio*, 432 U.S. 161 (1977), the United States Supreme Court enunciated the standard for determining whether two offenses are the same for purposes of barring successive prosecutions, applying the "same-elements" test first enunciated in *Blockburger v. United States*, 284 U.S. 299, 304 (1932), in the context of multiple punishments. The same-elements test focuses on the statutory elements of the underlying offenses, not on the specific proofs of the case. *See Vitale*, 447 U.S. at 416. The test inquires whether each offense contains an element not contained in the other. *Brown*, 432 U.S. at 166; *see also Vitale*, 447 U.S. at 416. If "'the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not.'" *Id.* (quoting *Blockburger*, 284 U.S. at 304). If not, they are the "same offense" and double jeopardy bars a second prosecution. *Id.* at 168-69.

The Michigan Court of Appeals analyzed the issue as follows:

"A person may not be twice placed in jeopardy for a single offense." *People v Mehall*, 454 Mich 1, 4; 557 NW2d 110 (1997). This protection is afforded under both the United States and Michigan Constitutions. US Const, Am V; Const 1963, art 1, § 15. The constitutional prohibition against double jeopardy provides three separate protections: "(1) it protects against a second prosecution for the same offense after acquittal, (2) it protects against a second prosecution for the same offense after conviction, and (3) it protects against multiple punishments for the same offense." *People v Nutt*, 469 Mich 565, 574; 677 NW2d 1 (2004).

In recent years, our Supreme Court held that the validity of successive prosecutions under the Michigan constitution is measured under the federal "same

elements test" enunciated in *Blockburger v United States*, 284 US 299, 304; 52 S Ct 180; 76 L Ed 306 (1932). *Nutt, supra* at 592. The *Nutt* Court specifically considered what constitutes a "second offense" within the meaning of the constitutional prohibition. *Id.* at 575. *Nutt* concluded that the *Blockburger* test, i.e., the "same elements" test, "is the well-established method of defining the Fifth Amendment term 'same offence.'" *Id.* at 576. "'The test is not whether the defendant has already been tried for the same act, but whether he has been put in jeopardy for the same offense.'" *Id.* at 577, quoting *Morey v Commonwealth*, 108 Mass 433, 434 (1871).

"In general, the *Blockburger* test 'inquires whether each offense contains an element not contained in the other; if not, they are the 'same offence' and double jeopardy bars additional punishment and successive prosecution.'" *People v Ford*, 262 Mich App 443, 448; 687 NW2d 119 (2004), quoting *United States v Dixon*, 509 US 688, 696; 113 S Ct 2849; 125 L Ed 2d 556 (1993). The *Blockburger* "same elements" test "'focuses on the statutory elements of the offense. If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.'" *Nutt*, *supra* at 576, quoting *Iannelli v United States*, 420 US 770, 785 n 17; 95 S Ct 1284; 43 L Ed 2d 616 (1975). In other words, under the *Blockburger* test, a subsequent prosecution for a crime from the same transaction is not barred as a subsequent prosecution for the "same offense" if establishing each crime "requires proof of a fact that the other does not." *Id.*

In this case, although defendant concedes that his double jeopardy protections did not prohibit the prosecution from trying him again for first-degree CSC under the theory of force or coercion, MCL 750.520b(1)(f), he asserts that the trial court erred when it permitted the prosecution to proceed again on the charge of first-degree CSC under the theory of mental or physical incapacitation, MCL 750.520b(1)(g). *Nutt* teaches that the double jeopardy analysis must focus on the statutory elements of the underlying offenses. *Nutt*, *supra* at 576. Thus, our analysis of the issue starts with the elements of the offenses involved.

To prove defendant guilty of first-degree criminal sexual conduct, MCL 750.520b under the theory of mental or physical incapacitation, MCL 750.520b(1)(g), the prosecutor must prove that defendant (1) sexually penetrated the victim, (2) caused personal injury to the victim, and (3) knew or had reason to know that the victim was mentally incapable, mentally incapacitated, or physically helpless. MCL 750.520b(1)(g). Further, MCL 750.520a provides definitions for "mentally incapable," "mentally incapacitated," and "physically helpless." It states as follows:

(h) "Mentally incapable" means that a person suffers from a mental disease or defect that renders that person temporarily or permanently incapable of appraising the nature of his or her conduct.

(i) "Mentally incapacitated" means that a person is rendered temporarily incapable of appraising or controlling his or her conduct due to the influence of a narcotic, anesthetic, or other substance administered to that person without his or her consent, or due to any other act committed upon that person without his or her consent.

* * *

(l) "Physically helpless" means that a person is unconscious, asleep, or for any other reason is physically unable to communicate unwillingness to an act. [MCL 750.520a.]

To prove defendant guilty of delivery of a controlled substance with the intent to commit criminal sexual conduct, MCL 333.7401a, the prosecutor must prove that defendant (1) delivered or caused to be delivered a controlled substance to the victim, (2) without the victim's consent, (3) to commit or attempt to commit criminal sexual conduct. See MCL 333.7401a.

Again, the double jeopardy analysis must focus on the statutory elements of the underlying offenses. *Nutt*, supra at 576. In reviewing the elements of the challenged offenses to perform the *Blockburger* "same elements" test, we conclude that the elements that must be proven for first-degree criminal sexual conduct, MCL 750.520b under the theory of mental or physical incapacitation, MCL 750.520b(1)(g), are not identical to those required to prove defendant guilty of delivery of a controlled substance with the intent to commit criminal sexual conduct, MCL 333.7401a. Establishing the charge of delivery of a controlled substance with the intent to commit criminal sexual conduct, MCL 333.7401a, requires a showing that defendant knowingly delivered a controlled substance to the victim. A careful reading of the elements of the statutes reveals that there is no similar delivery requirement necessary to establish the charge of first-degree criminal sexual conduct, MCL 750.520b under the theory of mental or physical incapacitation, MCL 750.520b(1)(g). Instead, all that is necessary is that the defendant took advantage of a "mentally incapable," "mentally incapacitated," or "physically helpless" victim.

In other words, establishing that defendant delivered a controlled substance to the victim is required to show that he committed the charge of delivery of a controlled substance with the intent to commit criminal sexual conduct, MCL 333.7401, but delivery is not required to establish that defendant committed the charge of first-degree criminal sexual conduct, MCL 750.520b under the theory of mental or physical incapacitation, MCL 750.520b(1)(g). Thus, defendant's subsequent prosecution for first-degree criminal sexual conduct, MCL 750.520b under the theory of mental or physical incapacitation, MCL 750.520b(1)(g) is not barred on double jeopardy grounds based on defendant's prior prosecution for

delivery of a controlled substance with the intent to commit criminal sexual conduct, MCL 333.7401.

The plain language of the double jeopardy clause protects individuals from being twice put in jeopardy for the same offense, not for the same conduct or actions. *Nutt*, supra at 580. In this case, defendant was not subjected to successive prosecutions for either the same offense or the same conduct. Because the two prosecutions punished different conduct and different offenses arising from that conduct, defendant has not established error.

(6/27/2008 MCOA Op. at 3-5 (footnotes omitted).)

In reaching its decision, the Michigan Court of Appeals's decision clearly applied the correct Supreme Court standard. In analyzing the elements of the offenses, the court properly concluded that, unlike delivery of a controlled substance with the intent to commit CSC I, the elements of CSC I based on mental incapacitation did not require proof that Petitioner himself delivered the drug that rendered Womack mentally incapacitated. The offense required only that Womack be mentally incapacitated due to the influence of a narcotic or other substance administered without her consent. As a consequence, the court properly concluded that delivery of a controlled substance with the intent to commit CSC I included an element not required to prove CSC I.

However, while the court of appeals accurately stated the *Blockburger* standard requiring that *each* offense must contain an element of the other, it failed to analyze whether proof of CSC I required any element not required to prove delivery of a controlled substance with the intent to commit criminal sexual conduct. If only one of the offenses includes an additional element, the second prosecution is barred by double jeopardy, typically because one offense will be a lesser included offense of the other. *See Brown*, 432 U.S. at 168.

In its decision, the court of appeals only generally described the elements of delivery of a controlled substance with the intent to commit criminal sexual conduct:

To prove defendant guilty of delivery of a controlled substance with the intent to commit criminal sexual conduct, MCL 333.7401a, the prosecutor must prove that defendant (1) delivered or caused to be delivered a controlled substance to the victim, (2) without the victim's consent, (3) to commit or attempt to commit criminal sexual conduct. See MCL 333.7401a.

(6/27/2008 MCOA Op. at 5.) However, section 333.7401a incorporates numerous kinds of criminal sexual conduct:

(1)  A person who, without an individual's consent, delivers a controlled substance or a substance described in section 7401b or causes a controlled substance or a substance described in section 7401b to be delivered to that individual to commit or attempt to commit *a violation of section 520b, 520c, 520d, 520e, or 520g of the Michigan penal code, 1931 PA 328, MCL 750.520b, 750.520c, 750.520d, 750.520e, and 750.520g*, against that individual is guilty of a felony punishable by imprisonment for not more than 20 years.

(2) A conviction or sentence under this section does not prohibit a conviction or sentence for any other crime arising out of the same transaction.

(3) This section applies regardless of whether the person is convicted of a violation or attempted violation of *section 520b, 520c, 520d, 520e, or 520g of the Michigan penal code, 1931 PA 328, MCL 750.520b, 750.520c, 750.520d, 750.520e, and 750.520g.*

MICH. COMP. LAWS § 333.7401a (emphasis added).  Here, Petitioner was charged and acquitted of delivery of a controlled substance with the intent to commit *first-degree* criminal sexual conduct, as described by MICH. COMP. LAWS § 750.520b.  To prove that crime, the prosecutor was required to demonstrate that Petitioner had the specific intent to violate or attempt to violate MICH. COMP. LAWS § 750.520b.  Incorporating the more detailed elements of the offense, the trial court in the 2005 case instructed the jury that it must find the following elements:

The defendant is charged with the crime of delivery of a controlled substance with the intent to commit criminal sexual conduct.  To prove this charge, the prosecutor must prove each of the following elements beyond a reasonable doubt: First, the defendant knowingly delivered a controlled substance to Carolee Womack. Second, the controlled substance was Valium/diazepam and the defendant knew it

- 38 -

was Valium/diazepam.  Third, the defendant did not have the consent of Carolee Womack to deliver Valium/diazepam to her.  Fourth, the defendant delivered Valium/diazepam to Carolee Womack *with a specific intent to engage, or attempt to engage, in a sexual act that involved entry by some part of the defendant's body into Carolee Womack's . . . genital opening or mouth . . . while Carolee Womack was mentally incapacitated or physically helpless, or be force or coercion.*

The defendant's intent may be proved by what he said, what he did, how he did it, or by any other facts and circumstances in evidence.

As used in Fourth, above: Delivery means that the transferred Valium/diazepam to Carolee Womack, knowing that it was Valium/diazepam and intending to transfer it to Carolee Womack.

Mentally incapacitated means that Carolee Womack was temporarily unable to understand or control what she was doing because of a narcotic, anesthetic, or other substance administered to her without her consent.

Force is enough if the defendant was giving Carolee Womack a medical exam or treatment and did so in a way or for a reason that is not recognized as medically acceptable.  A physical exam by a nurse that includes inserting fingers into the vagina is not in . . . itself criminal conduct.  You must decide whether the defendant did the . . . exam or treatment as an excuse for sexual purposes and in a way that is not recognized as medically acceptable.

The crime of delivery of a controlled substance with the intent to commit criminal sexual conduct requires proof of a specific intent.  This means that the prosecution must prove not only that the defendant did certain acts, but that, the defendant did the acts with the intent to cause the result described in Fourth above.  As stated in Fourth above, the defendant's intent may be proved by what he said, what he did, how he did it, or by any other facts and circumstances in evidence.

(Tr. 1, Vol. XI at 29-30 (emphasis added).)  The instructions on the fourth element of the delivery statute incorporated the elements of CSC I under the theory of mental incapacitation or physical helplessness, with one critical difference:  the delivery offense did not require proof that Petitioner actually committed CSC I, only that he intended to commit or intended to attempt to commit CSC I.  As a result, the elements of the offense of delivery of a controlled substance with the intent to commit or attempt to commit CSC I do not include proof of actual penetration or that actual injury

- 39 -

occurred. Instead, it would require proof only that Petitioner delivered the drug with the intent to attempt such penetration and injury. Therefore, the elements of CSC I, which required proof of actual penetration and injury, included at least one element that delivery of a controlled substance with the intent to commit or attempt to commit did not. Even though the analysis of the court of appeals was incomplete, its decision was correct. As a consequence, the Michigan Court of Appeals did not unreasonably apply the *Blockburger* standard in determining that Petitioner's second prosecution violated the Double Jeopardy Clause's successive-prosecution clause.

## II. Double Jeopardy – Collateral Estoppel

In his second habeas ground, Petitioner contends that the doctrine of collateral estoppel barred the prosecution from introducing evidence that he administered Valium to Womack without her consent. The Supreme Court has recognized that the Double Jeopardy Clause of the Fifth Amendment encompasses the doctrine of collateral estoppel. *See Ashe v. Swenson*, 397 U.S. 436, 443-44 (1970). The doctrine stands for the principle "that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Id.* at 443. The collateral estoppel doctrine does not always preclude the use of evidence against a defendant in a second trial when the defendant was found not guilty in the first trial. *See Dowling v. United States*, 493 U.S. 342, 348 (1990) (permitting use of evidence under FED. R. EVID. 404(b)). However, the rule is not applied in a "hypertechnical" fashion. *Ashe*, 397 U.S. at 444. Instead, when the previous judgment of acquittal was based on a general verdict, the court must

> examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a jury could have grounded

its verdict upon an issue other than that which the defendant seeks to foreclose from consideration.

*Id.* (internal quotation omitted); *see also Schiro v. Farley*, 510 U.S. 222, 233 (1994). "The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.'" *Ashe*, 397 U.S. at 444 (quoting *Sealfon v. United States*, 332 U.S. 575, 579 (1948)). "Any test more technically restrictive would . . . amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal." *Id.*

The trial court analyzed the collateral estoppel issue as follows, making multiple determinations about the facts presented at trial:

> The Double Jeopardy Clause in the 5th Amendment also provides issue preclusion through the collateral estoppel doctrine. *Ashe v. Swenson*, 397 US 436; 90 SCT 1189; 25 LEd 2d (1970) (concurring opinions by Black, Harlan and Brennan, JJ; dissenting opinion by Burger, CJ). "Collateral estoppel' . . . means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit.'" *Ashe*, 397 US 443. The collateral estoppel doctrine in the Double Jeopardy Clause applies to the states through the 14th Amendment. *Ashe*, 397 US 445-446.

> The collateral estoppel doctrine through the Double Jeopardy Clause does not, in all contexts, preclude the use of evidence against a defendant in a 2nd trial where the defendant was found not guilty in the 1st trial. See, for example, *Dowling v United States*, 493 US 342, 348; 110 SCt 668; 107 LEd 2d 708 (1990), allowing evidence under FRE 404(b). Also, see, *People v Oliphant*, 399 Mich 472; 250 NW2d 443 (1976), to the same result for MRE 404(b).

> **1st Trial Issue**

> In Double Jeopardy Clause jurisprudence, the determination of whether collateral estoppel applies to a criminal proceeding, "requires a court to 'examine the record of a prior proceeding, taking into account the pleadings, evidence, charge, and other relevant matter, and conclude whether a rational jury **could** have grounded its verdict upon an issue other than that which the defendant seeks to foreclose from

consideration.'  The inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.'  Any test more technically restrictive would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal."  *Ashe*, p 444, citation omitted, emphasis supplied.

In the context of the issue here, *can*, the present tense of *could*, is defined as, "be made possible or probable by circumstances . . . ."  Merriam-Webster Online Dictionary; http:// www.m-w.com/dictionary/can.  I must determine the possibilities and the probabilities of the issues on which the jury could have found Defendant not guilty on Count 2.

I was the judge who presided over the 1st trial.  Defendant presented expert testimony that diazepam (Valium) entered Complainant's body 8 to 12 hours before the blood draw at the South Bend hospital, and diazepam could not possibly have entered Complainant's body less than 6 hours before the blood draw.  Complainant's Lakeland records note that Phenergan was injected at 5:10 pm, and the blood draw at the South Bend hospital was at 11:20 pm (Michigan time).  Further, Defendant claimed that Complainant had access to Valium; she had received an injection of Valium during a hospitalization about 1 month earlier, when she also was given a Valium pill to take orally.  Valium is 1 of the 3 drugs most tested by the Michigan State Police for criminal activity and is available on the street.

Defendant also presented evidence that he administered Phenergan as ordered.  The presence of promethazine (Phenergan) was confirmed by a forensic analysis of Complainant's blood drawn at the South Bend hospital, along with an expert opinion that Phenergan entered Complainant's body at a time consistent to that noted on her Lakeland records.  Phenergan is an antihistamine with sedative properties and could have caused Complainant to lose consciousness.

In contrast, Plaintiff's expert testified that diazepam entered Complainant's body between 2 to 12 hours before the blood draw, and Complainant testified that she had not taken Valium in the previous month.  Plaintiff also presented Lakeland records that Defendant had not properly disposed of Valium in the past, arguing that Defendant had access to Valium which he inject[ed] into Complainant.

The elements of Count 2 are set forth in the jury instructions.

"First, the defendant knowingly delivered a controlled substance to [Complainant].

"Second, the controlled substance was Valium/diazepam, and the defendnant knew it was Valium/diazepam.

"Third, the defendant did not have the consent of [Complainant] to deliver Valium/diazepam to her.

"Fourth, the defendant delivered Valium/diazepam to [Complainant] with the specific intent to engage, or attempt to engage, in a sexual act that involved entry by some part of the defendant's body into [Complainant's] genital opening or mouth:

    while [Complainant] was mentally incapacitated or physically helpless, or

    by force or coercion."  [See, Appendix A, p 7.]

The 1st element and the 4th element were vigorously contested.  The 2nd element, the presence of diazepam in Complainant's body, was uncontradicted.

Defendant did not contest the 3rd element, lack of consent.

As to the 4th element, if the jury had a reasonable doubt that Defendant intended to engage in sexual penetration of Complainant, a rational jury would have found Defendant not guilty of Count 1, since each theory under Count 1 required a sexual act of penetration.  The jury did not find Defendant not guilty on Count 1, and the only rational explanation is that the jury did not base its not guilty verdict in Count 2 on the 4th element.

That leaves the 1st element as the basis for the jury's not guilty verdict.  Plaintiff posits 3 theories from which it argues that the jury could have found Defendant not guilty on Count 2 for a reason other than the 1st element.  Plaintiff claims that the jury might have concluded that Defendant's intent, required by the 4th element, changed over time.  Plaintiff hypothesizes:  the jury might have concluded that, when Defendant injected Valium into Complainant, he only intended to kiss her, or to observe her, or perhaps sexually fondle her, but not to penetrate her, analogizing to Defendant's conduct as portrayed by one of the MRE 404(b) witnesses.

I find that Plaintiff's argument is within the wide ambit of possibilities, but I also find that it is highly improbable.  There was no focus on the timing of Defendant's intent to penetrate Complainant by either Plaintiff or Defendant during the trial.  The jury instruction did not draw attention to the timing of Defendant's intent.  During his opening statement and his final argument, Defendant made no such argument.  As the trial judge, and through my observations of the jurors as well as the witnesses, I find the likelihood that the jury decided its not guilty verdict on a delay of the time when Defendant formed his intent to penetrate, or attempt to penetrate, as highly improbable.

Plaintiff's 2nd claim is that the jury might have been confused by the sentence structure of the 4th element. Plaintiff argues that the jury might have misconstrued the phrases, "while [Complainant] was mentally incapacitated or physically helpless, or by force or coercion" as modifying "defendant delivered" rather than "with the specific intent to engage, or attempt to engage[."] Under Plaintiff's construction, the 4th element would require the jury to consider whether Defendant delivered Valium to Complainant while she was mentally incapacitated or physically helpless, which is nonsensical since Plaintiff claims that the purpose of the Valium was to make Complainant incapacitated or helpless. Plaintiff points to nothing in the record to support its claim, such as a question from the jury about that instruction. It is raw speculation, the type against which *Ashe* cautioned, and I find the probability that the jury made its not guilty decision on misconstruing those phrases is nil.

Plaintiff's third claim is that the jury might have concluded that Complainant consented to an injection of Valium, citing her execution of a Consent for Medical Treatment form. Plaintiff has provided no reference in the record to the Consent for Medical Treatment form. If the Consent for Medical Treatment was a part of the record, Plaintiff has not demonstrated that the jury saw it. If there is such a form, I can only conclude that the heading, Consent for Medical Treatment, captures its essence, that Complainant consented to medical treatment, but not to non-medical treatment, such as an injection of a drug, not ordered by the treating physician, for the purpose of causing her to lose consciousness so that she could be sexually assaulted. Since the treating physician did not order Valium, a rational jury could not conclude that an injection of Valium was for medical treatment; thus, Valium was not an injection to which Complainant consented. Indeed, Complainant herself refuted Plaintiff's argument in her trial testimony. Trial, vol II, p 86; questions posed by Plaintiff.

"Q    Carolee, did you know what it was the defendant was injecting you with at the hospital"

"A    No.

"Q    What did you think he was injecting you with?

"A    Phenergan.

"Q    Did you give the defendant or anybody else permission to inject you with anything other than phenergan?

"A    No.["]

I find the probability that the jury based its not guilty verdict for Count 2 on its finding that Plaintiff did not prove beyond a reasonable doubt the 1st element, that Defendant injected Valium into Complainant.

**2nd Trial**

Having identified the issue decided by the jury in the 1st trial, I must determine whether Plaintiff is precluded from presenting that issue in the 2nd trial. In *Dowling*, the Court held that collateral estoppel requires the issue of ultimate fact decided in the 1st trial to be an "ultimate issue" in the 2nd trial. *Dowling*, 493 US 348. Justice Brennan dissented, joined by Justices Marshall and Stephens, saying, "[T]he Court's reasoning appears to extend even further than the facts of this case and seems to allow a prosecutor to rely on a prior criminal offense (despite an acquittal) as evidence in a trial for an offense which is part of the *same transaction* as the prior offense." *Dowling*, 493 US 363, emphasis in original.

*Dowling* was decided in January 1990. In May of that year, in *Grady* the Court included the same-conduct test as one of the Double Jeopardy Clause tests; Justice Scalia dissented, expressing his view on the difficulties of implementing that test. *Grady*, 495 US beginning at 568. Three years later, the Court overruled *Grady* in *Dixon*, eliminating the same-conduct test and leaving in place the *Blockb[u]rger* same-elements test. Neither party has provided me with a United States Supreme Court case decided after *Dixon* which describes the test to apply to criminal collateral estoppel through the Double Jeopardy Clause, nor have I found such a case. Since *Dowling* rejected the same-transaction test advocated by Justice Brennan, and since *Dixon* rejected the same-conduct test and approved the same-elements test, I conclude that the same-conduct and same-transaction tests do not apply, and the same-elements test forms the basis for an analysis under the collateral estoppel doctrine through the Double Jeopardy Clause.

I find that, if the ultimate issue of fact decided in the 1st trial is an element of the crime charged in the 2nd trial, the prosecution is precluded from proving that element, and the charge must be dismissed, even if it survives the *Blockburger* test. If it is not an element of the crime charged in the 2nd trial, the prosecution is not precluded from presenting evidence which supported the ultimate issue decided in the not guilty verdict in the 1st trial. The question then becomes, whether Defendant's alleged delivery of Valium to Complainant is an element of the crime charged in the 2nd trial. I find that it is not.

The re-trial will be on a charge of criminal sexual conduct, 1st degree, on theory B, personal injury and force or coercion, and on theory C, personal injury and complainant mentally incapacitated or physically helpless. There is no element in either of Plaintiff's theories that requires a finding that Defendant delivered Valium

- 45 -

to Complainant.  See, Appendix A, pp 1, 4-5.  I find that the collateral estoppel doctrine through the Double Jeopardy Clause does not preclude Plaintiff from presenting evidence and arguing that Defendant delivered Valium to Complainant.

There is federal authority to the contrary, that collateral estoppel prohibits evidence in a re-trial which is inconsistent with a previous not guilty verdict, even if the issue itself is not precluded.  *See, Wingate v. Wainwright*, 464 F.2d 209, 215 (5th Cir[.] 1972) and 109 Harv L Rev 1729, *The Due Process Roots of Criminal Collateral Estoppel*.  *Oliphant* expressly declined to follow *Wingate*, 399 Mich 497-498, and *Dowling* and *Dixon* were decided after *Wingate*.  Also, the 5th Amendment Due Process Clause with its concept of fundamental fairness does not apply to this analysis.  *Dowling*, 493 US 352-353.

. . .

The Double Jeopardy Clause of the 5th Amendment prohibits Plaintiff from trying Defendant again for criminal sexual conduct, 1st degree, under theory A, MCL 750.520b(1)(c).  It does not prohibit Plaintiff from trying Defendant under theory B, MCL 750.520b(1)(f) and theory C, MCL 750.520b(1)[g].

(5/30/06 Cir. Ct. Op. at 4-13, 15, docket #22 (emphasis in original, footnote omitted.)

Petitioner raised the same claim on appeal.  In addressing the issue, the Michigan Court of Appeals failed even to mention the detailed opinion and factual determinations of the trial court.  Instead, applying the *Ashe* standard, the court of appeals decided both the legal and the factual issues *de novo*:

Defendant next argues that the doctrine of collateral estoppel precludes the prosecution from presenting evidence that defendant administered a drug without consent.  The prosecutor responds that collateral estoppel did not bar evidence of defendant's delivery of Valium to the victim in defendant's second trial.  We review de novo the applicability of collateral estoppel.  *Minicuci v Scientific Data Mgt, Inc*, 243 Mich App 28, 34; 620 NW2d 657 (2000).

Collateral estoppel is "embodied in the Fifth Amendment guarantee against double jeopardy."  *Ashe v Swenson*, 397 US 436, 445; 90 S Ct 1189; 25 L Ed 2d 469 (1970). In *Ashe*, the United States Supreme Court defined collateral estoppel as follows:

"Collateral estoppel" is an awkward phrase, but it stands for an extremely important principle in our adversary system of justice. It means simply that when an issue of ultimate fact has once been determined by a valid and full judgment, that issue cannot again be litigated between the same parties in any future lawsuit.

\*\*\*

The ultimate question to be determined, then, . . . is whether this established rule of federal law is embodied in the Fifth Amendment guarantee against double jeopardy. We do not hesitate to hold that it is. For whatever else that constitutional guarantee may embrace, it surely protects a man who has been acquitted from having to "run the gantlet" a second time. [*Id.* at 443, 445-446 (citations omitted).]

*Ashe* requires that, after a thorough search of the record, a reviewing court must determine what issues a jury must have decided in reaching its verdict. If the jury might not have decided a specific issue, that issue will not be foreclosed. The reviewing court must decide whether a jury could have based its decision on an issue other than that which the defendant seeks to preclude from consideration. *Ashe*, *supra* at 444. "The inquiry must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings." *Id.* (internal quotation omitted.)

Our Supreme Court has stated that "[c]ollateral estoppel precludes relitigation of an issue in a subsequent, different cause of action between the same parties where the prior proceeding culminated in a valid, final judgment and the issue was (1) actually litigated, and (2) necessarily determined." *People v Gates*, 434 Mich 146, 154; 452 NW2d 627 (1990). *Gates* counsels that in analyzing whether an issue was "actually litigated" in a prior proceeding, this Court must consider "whether the party against whom collateral estoppel is asserted has had a full and fair opportunity to litigate the issue." *Id.* at 156-157. Moreover, an issue is "necessarily determined" in a previous proceeding "only if it is 'essential' to the judgment." *Id.* at 158, quoting 1 Restatement Judgments, 2d, § 27, p 250, comment h, p 258. "The inability of a court to determine upon what basis an acquitting jury reached its verdict, is, by itself, enough to preclude the defense of collateral estoppel." *Id.*

Here, defendant argues in particular that the collateral estoppel [doctrine] should have operated to preclude the prosecution from presenting evidence at the second trial that he administered a drug without consent to the victim for the reason that he was acquitted of the charge of delivery of a controlled substance with the intent to commit criminal sexual conduct, MCL 333.7401, at his first trial. But after reviewing the record, we conclude that the jury could have based its acquittal decision on an issue other than that which the defendant seeks to preclude from

consideration. *Ashe*, supra at 444. In fact, our review of the record reveals that the jury could have reasonably based its acquittal on more than one basis, not simply on the general factual conclusion that defendant did not administer a drug without consent to the victim. *Gates*, supra at 158.

To prove defendant guilty of delivery of a controlled substance with the intent to commit criminal sexual conduct, MCL 333.7401a, the prosecutor must prove that defendant (1) delivered or caused to be delivered a controlled substance to the victim, (2) without the victim's consent, (3) to commit or attempt to commit criminal sexual conduct. See MCL 333.7401a. Regarding the first element, the jury could have believed, based on the proofs, that the substance defendant injected the victim with was not Valium and therefore was not a controlled substance as required by the statute. The jury could have believed that defendant injected the victim with Phenergan as prescribed by Dr. Holbert and that Valium was found in the victim's blood because she had ingested Valium in pill form of her own volition. Regarding the second element, a rational jury could have believed that the victim actually "consented" to the injection when she permitted defendant to inject her with medication after Dr. Holbert prescribed her Phenergan to settle her nausea. Finally, regarding the third element, under the circumstances of this case the jury could reasonably have concluded that at the time defendant injected the victim arguably with Valium, he did not actually intend to commit first-degree criminal sexual conduct. Instead, the jury could have concluded that defendant did not intend to commit any crime at the moment of injection and only later decided to commit a crime after the victim was rendered unconscious. Or, the jury could have concluded that at the time defendant injected the victim he intended to commit a crime, but a crime less than first-degree criminal sexual conduct, e.g. something less than penetration such as only removing the victim's underwear. Again, "[t]he inability of a court to determine upon what basis an acquitting jury reached its verdict, is, by itself, enough to preclude the defense of collateral estoppel." *Gates*, *supra* at 158. Thus, the doctrine of collateral estoppel did not bar evidence of defendant's delivery of Valium to the victim in defendant's second trial.[3]

[3] As an alternative basis for affirmance, the prosecution argues that defendant's retrial in this matter based on the same felony information is not a "subsequent, different cause of action" within the meaning of collateral estoppel and thus collateral estoppel should not apply in this context. In support of its argument, the prosecutor cites *People v Thompson*, 424 Mich 118, 127; 379 NW2d 49 (1985), for the proposition that hung jury mistrials have consistently been considered as nullities and subsequent retrials have been determined to be nothing more than a continuation of the same case. While we find this argument interesting in that it involves the most basic tenet of the doctrine of collateral estoppel, we decline to address it in light of our resolution of the issue. Though were we to address it, it would ultimately fail because the United States Supreme Court has specifically found that collateral estoppel applies in the criminal context because it is "embodied in the Fifth Amendment guarantee against double jeopardy." *Ashe*, supra at 445.

(MCOA Op. at 6-7.)

The court of appeals based its determination on *de novo* review, citing the standard applied to collateral estoppel determinations in nonconstitutional settings. However, in contrast to ordinary applications of the collateral estoppel doctrine, "the rule of collateral estoppel in criminal cases is not to be applied with the hypertechnical and archaic approach of a 19th century pleading book . . . ." *Ashe*, 397 U.S. at 444. Instead, the application of the doctrine in the criminal setting rests on a pragmatic and fact-intensive examination of the record. In determining the ultimate fact on which the jury based its decision, the trial court made numerous findings of fact. Yet without even acknowledging the trial court's factual determinations, the court of appeals made contrary factual findings that were inconsistent with the facts and theories presented at trial. The court of appeals accepted factual theories that the trial judge, on the basis of the evidence and arguments actually presented at trial, dismissed as "raw speculation." As the Sixth Circuit recently has recognized, a state appellate court acts unreasonably when it fails to give deference to the trial court's factual findings. *See Foster v. Wolfenbarger*, 687 F.3d 702, 708-09 (6th Cir. 2012) (citing *Leonard v. Michigan*, 256 F. Supp. 2d 723, 732 (W.D. Mich. 2003) for the proposition that it is appropriate for a federal court on habeas review to give "deference to the state trial court's findings on trial counsel's deficiencies and [to deem] the state appellate court 'unreasonable' for not doing the same").

Nevertheless, regardless of whether the court of appeals should have given deference to the trial court, the appellate court's conclusions about the possible bases of the jury's verdict of acquittal were unreasonable because they were purely hypothetical rather than based on the circumstances of the actual case – in direct contravention of the Supreme Court's admonition in *Ashe*

- 49 -

that the "inquiry 'must be set in a practical frame and viewed with an eye to all the circumstances of the proceedings.'" *Ashe*, 397 U.S. at 444 (quoting *Sealfon*, 332 U.S. at 579). Rather than following *Ashe*'s direction to analyze the issue with reference to the "pleadings evidence, charge or other relevant matter," 397 U.S. at 444, the court of appeals engaged in hypothetical speculation, untethered to the evidence and arguments actually presented. If this were the law, no acquittal could ever have collateral estoppel effect, because a reviewing court can always imagine some basis, however farfetched, for concluding that a jury's general verdict rested on some other finding. *See Ashe*, 397 U.S. at 444 n.9.

It is patently clear from the transcript of the first trial that the trial judge's factual conclusions about the necessary basis of the jury's decision were not only reasonable conclusions but also the *only* reasonable conclusions that could be drawn. Despite the court of appeals' speculation to the contrary, absolutely nothing in the record evidence would have allowed a reasonable jury to find that Petitioner delivered a drug to Womack without her consent that was not Valium. Womack testified that she consented to the administration of Phenergan, and the only other drug discussed at trial was Valium. No evidence or argument would have supported a reasonable jury's conclusion that some unknown, uncontrolled drug was administered without Womack's consent.

The court of appeals' next suggested alternative – that the jury concluded that Petitioner injected only Phenergan as prescribed and that Womack injested Valium orally – is nothing more than a restatement of the conclusion that Petitioner did not inject Womack with Valium. It therefore cannot be considered an alternative basis for the jury's decision.

The possibility that Womack consented to the administration of Valium, a drug that was not prescribed, simply because she consented to being given Phenergan is nonsensical, as the trial court observed. Womack consented only to the administration of prescribed medication, which did not include Valium. Womack specifically testified that she did not consent to the administration of Valium, and the defense did not dispute the issue. (Tr. 1, vol. II at 23.)

Finally, the appellate court's suggestion that a reasonable jury could have found that Petitioner injected Womack with Valium but only formed the intent to commit CSC I at a later time is thoroughly implausible on the record of the case. As the trial court recognized, no argument or evidence was introduced to support the conclusion that Petitioner's intent changed over time. The prosecution's entire theory of the case was that Petitioner hoarded leftover Valium for the express purpose of administering it to vulnerable female patients so he could commit CSC I. The basis for the introduction of evidence of a plan or scheme under MICH. CT. R. 404(b) was that Petitioner had the intent to commit criminal sexual conduct at the time he hoarded the Valium and delivered it to Womack and to other vulnerable women.

For all these reasons, the factual findings of the trial court were entirely reasonable and consistent with the trial record. In contrast, the court of appeals' contrary findings were fantastic and wholly unsupported in the record of the case as it was actually tried. The court of appeals acted unreasonably when it reached a different conclusion without giving deference to, or even acknowledging, the trial court's determinations. *See Foster*, 687 F.3d at 708-09.

Although the trial court's factual conclusions were clearly correct, the law the trial court applied to those facts was contrary to clearly established Supreme Court precedent. The trial court discussed the *Ashe* standard, but it incorrectly concluded that the *Ashe* standard had been

collapsed into the same-elements test of *Blockburger* by the Supreme Court's subsequent decisions in *Dowling*, 493 U.S. 342, *Grady v. Corbin*, 495 U.S. 508 (1990), and *United States v. Dixon*, 509 U.S. 688 (1993). (*See* 5/30/06 Cir. Ct. Op. at 12-13.) The trial court's error arises from its improper reliance on the Supreme Court's double-jeopardy jurisprudence without making appropriate distinctions between the various protections of the clause. Although the doctrine of collateral estoppel draws its constitutional force in criminal cases from the Double Jeopardy Clause, the principles governing collateral estoppel and double jeopardy are distinct. By virtue of the doctrine of collateral estoppel, an acquittal in a case is conclusive on those factual issues necessarily determined by the acquittal. *See Sealton v. United States*, 332 U.S. 575, 578 (1948). Even though the subsequent prosecution may be for a different offense, and thus not within the bar of double jeopardy, permitting the state to force an acquitted defendant to relitigate the identical factual question arising from the same cause of conduct would permit the very abuses that led English judges to prohibit double jeopardy, long before that protection was enshrined in the Fifth Amendment. 2A. CHARLES ALAN WRIGHT & PETER J. JENNING, FEDERAL PRACTICE & PROCEDURE: CRIMINAL § 468 at 381-3 (4th ed. 2009). Criminal collateral estoppel is not, and never has been, governed by the same tests as apply to double jeopardy claims. The trial court's confusion of these two concepts was objectively unreasonable, and an examination of *Ashe* and subsequent Supreme Court cases provides no support whatsoever for the state court's analysis.

In *Ashe*, 397 U.S. 436, the Supreme Court considered a situation in which a defendant, along with three others, was tried for the armed robbery of one of six poker players. The jury was instructed that, if they found that the defendant was one of the participants in the armed robbery and, if any money was taken from the victim, the defendant was guilty, even if the defendant

did not personally take any money from the victim.  The jury found the defendant not guilty of armed

robbery.  The defendant was charged and tried for the armed robbery of a second poker player, and

the jury was instructed in a virtually identical fashion.  The Supreme Court held that the second

prosecution was improper, finding that "[t]he single rationally conceivable issue in dispute before

the jury was whether the petitioner had been one of the robbers." *Id.* at 445.  The case stands for the

proposition that, "when an issue of ultimate fact has once been determined by a valid and final

judgment [of acquittal], that issue cannot again be litigated between the same parties in any future

lawsuit." *Id.* at 443.

        In *Dowling*, 493 U.S. 342, the Supreme Court declined to extend the *Ashe* principle

to bar all uses of previously decided facts in any future prosecution.  The defendant in *Dowling* was

tried for various offenses arising out of a bank robbery on July 8, 1985, during which the defendant

wore a ski mask and carried a small gun.  During the bank-robbery trial, the prosecutor introduced

evidence from a woman who claimed she had been robbed by the defendant and another man, Delroy

Christian, two weeks after the bank robbery.  The woman testified that, during the robbery of her

house, the defendant was wearing a similar ski mask and carrying a similar gun as the perpetrator

in the bank-robbery case.  During the course of the robbery of her house, the woman unmasked the

defendant, allowing her to identify him.  At the time of the bank-robbery trial, the defendant already

had been acquitted of robbing the woman.  The government sought to introduce the woman's

testimony to show the similarity in the offenses and the connection between the defendant and

Delroy Christian, who had been seen with the defendant shortly before the bank robbery.  The trial

court specifically instructed the jury that the defendant had been found not guilty of the robbery of

the woman and emphasized the limited purpose for which the testimony was offered.  Although the

*Dowling* Court recognized the continuing viability of the *Ashe* standard, it concluded that admission

of the woman's testimony was not barred by collateral estoppel.  *Id.* at 349.   The Court held that,

unlike in *Ashe*, Dowling did not argue that the prior acquittal rested on a ultimate issue  that the jury

was required to decide in the bank-robbery trial.   The Court therefore declined to extend the *Ashe*

doctrine to "exclude in all circumstances . . . relevant and probative evidence that is otherwise

admissible under the Rules of Evidence simply because it relates to alleged criminal conduct for

which a defendant has been acquitted."  *Id.* at 348.   The Court held that the collateral-estoppel

doctrine did not apply in *Dowling* because admission of the woman's testimony under Rule 404(b)

in Dowling's bank-robbery trial did not require the second jury to find beyond a reasonable doubt

that Dowling was the man who entered the woman's house.  *Id.* at 348-49.  Moreover, the Court held

that, even if the collateral-estoppel doctrine applied in the circumstances of Dowling's case, the

evidence was admissible because Dowling failed to prove that the jury in the first trial based its

acquittal on a conclusion that Dowling did not enter the woman's house.   The Court cited to

evidence that, at the first trial, Dowling had not disputed the woman's identification; instead, he

claimed that he had not committed robbery because he and Christian "merely came to retrieve . . .

money from an individual in the house."  *Id.* at 351 (internal quotations omitted).

   Although the *Dowling* case did not adopt the same-transaction test proposed by

Justice Brennan,[3] it in no way undermined *Ashe*'s holding that, after acquittal, a second jury may not

re-decide an issue of ultimate fact decided by the first jury.   In other words, the *Dowling* Court

---

   [3]Under the same-transaction test proposed by Justice Brennan in dissent, the collateral-estoppel rule would have barred the use of evidence whenever a defendant was forced to relitigate in any fashion the facts underlying a prior offense for which he was acquitted.  *Id.* at 361.   Justice Brennan's test also would have required the government, not the defendant, to prove that the first jury rested its decision on something other than identity.  *Id.* at 358.

merely declined to extend *Ashe* to circumstances in which the ultimate issue was not being retried by the jury in the second trial. As a result, the *Ashe* standard for collateral estoppel was unchanged by *Dowling*, and the trial court was clearly wrong in concluding otherwise. A state court acts unreasonably when it refuses to follow an applicable Supreme Court case on the mistaken belief that subsequent Supreme Court decisions *sub silento* overruled that case.

The trial judge also questioned the implications of the Supreme Court's decision in *Grady*, 495 U.S. 508, which was overruled only a few years later in *Dixon*, 509 U.S. 688. In *Grady*, the Supreme Court established an additional test for successive prosecutions, beyond the *Blockburger* test. The Court held that a defendant who had previously pleaded guilty to the misdemeanor offenses of driving while intoxicated and failing to keep to the right of the median could not subsequently be prosecuted on the offenses of reckless manslaughter and criminally negligent homicide based on proofs that he had been driving while intoxicated and failed to keep to the right of the median. *Id.* at 519. By adopting this "same-conduct" test, the *Grady* Court expanded the double-jeopardy bar to second prosecutions occurring *after conviction* on charges involving proof of the same ultimate facts, even though the second prosecution was not barred by *Blockburger*. *Grady*, while mentioning *Ashe* in support of the expansion, did not purport to address the *Ashe* circumstances: a second prosecution *after acquittal* on charges involving proof of the same ultimate facts. *Id.* at 519 (citing, *inter alia*, *Ashe*, 397 U.S. 436).

Just three years after *Grady*, the Supreme Court decided *Dixon*, 509 U.S. 688. The *Dixon* Court considered two separate cases involving the preclusive effect of prior criminal contempt convictions on subsequent prosecutions involving proof of the same conduct. In Dixon's case, the Court considered whether Dixon's earlier conviction for criminal contempt (based on a finding that

he violated his bond condition by possessing cocaine with intent to distribute) barred his subsequent prosecution for possessing cocaine with intent to distribute.  In the other case before the *Dixon* Court, defendant Foster argued that his contempt convictions for violating a civil protection order barred his subsequent prosecution for assault and assault with intent to kill based on the same conduct.  The Supreme Court overruled the same-conduct test of *Grady*, holding that a subsequent prosecution for a new offense following *conviction* on an earlier charge that required proof of the same conduct did not violate double jeopardy unless it was barred by the *Blockburger* test.  In reaching its decision, the Court expressly indicated that its decision in *Dixon* did not implicate the collateral-estoppel rule of *Ashe*:

> The collateral-estoppel effect attributed to the Double Jeopardy Clause, *see Ashe v. Swenson*, 397 U.S. 436, 90 S. Ct. 1189, 25 L. Ed. 2d 469 (1970), may bar a later prosecution for a separate offense where the Government has *lost* an earlier prosecution involving the same facts.  But this does not establish that the Government "must . . . bring its prosecutions . . . together."  It is entirely free to bring them separately, and can win convictions in both. Of course the collateral-estoppel issue is not raised in this case.

*Id.* at 705 (emphasis in original).  The holding in *Ashe*, therefore, was not affected by the decisions in either *Grady* or *Dixon*.  The fact that the *Dixon* Court rejected *Grady*'s same-conduct test is irrelevant to the collateral-estoppel rule of *Ashe*.  The analysis in *Dixon* is applicable only when the a defendant has been *convicted* in a prior proceeding.  The analysis in *Ashe* is applicable when the defendant has been *acquitted* in a prior proceeding.

Moreover, since *Dowling* (decided in 1990), *Grady* (decided in 1990), and *Dixon* (decided in 1993), the Supreme Court has continued to apply the *Ashe* collateral-estoppel test  when determining whether the *acquittal* of a defendant on one offense may bar prosecution or reprosecution on another offense.  *See Schiro*, 510 U.S. at 232-36 (applying *Ashe* to determine

whether the jury's resolution of a criminal verdict collaterally estopped the use of evidence in the sentencing phase to support a theory on which the jury failed to return a verdict because it already had found guilt on a different theory). The *Schiro* decision, decided in 1994, reiterated the *Ashe* standard long before the trial court reached its decision on May 30, 2006. The *Ashe* standard therefore was clearly and continuously established at the time Petitioner's case became final.[4]

As a consequence, it is apparent that the trial court erred in concluding that the Supreme Court's decisions in *Dowling*, *Grady*, and *Dixon* undermined the collateral-estoppel test of *Ashe* and left only the same-elements test of *Blockburger*. Moreover, while the Michigan Court of Appeals applied the correct legal standard, it did so using factual findings that were unreasonable both because the court both failed to give deference to the findings of the trial judge and because it failed to apply the standard in the case-specific way required by *Ashe*. As a result, giving deference to the facts found by the trial court, which are inescapable on the trial court record, this Court must decide whether Petitioner's second trial on CSC I under the theory of mental incapacity was barred by the collateral-estoppel doctrine of *Ashe*.

The first jury necessarily concluded that Petitioner did not inject Womack with Valium. In addition, Petitioner did not dispute that any injection of Valium would have been without Womack's consent. An uncontested element necessary to the conviction may not be proffered as an alternative basis for the jury's result precluding collateral estoppel:

> "If a later court is permitted to state that the jury may have disbelieved substantial and uncontradicted evidence of the prosecution on a point the defendant did not

---

[4] Although a habeas court may not rely on Supreme Court opinions issued after the state-court decision, the Supreme Court cases issued after 2006 continue to hold, as they have since 1970, that *Ashe* controls the collateral estoppel effect of jury verdicts of acquittal. *See, e.g., Yeager v. United States*, 557 U.S. 110, 119-20 (2009); *see also Bobby v. Bies*, 556 U.S. 825, 836 (2009) (reaffirming that the collateral-estoppel doctrine of *Ashe* is limited to cases in which a defendant has been acquitted and finding no factual basis for collateral estoppel under *Ashe*).

> contest, the possible multiplicity of prosecutions is staggering. * * * In fact, such a restrictive definition of "determined" amounts simply to a rejection of collateral estoppel, since it is impossible to imaging a statutory offense in which the government has to prove only one element to sustain a conviction."

*Ashe*, 397 U.S. at 444 n.9 (quoting Daniel K. Mayers & Fletcher L. Yarbrough, *Bis Vexari: New Trials and Successive Prosecutions*, 74 HARV. L. REV. 1, 38-39 (1960)).  The jury, therefore, necessarily found that Petitioner had not administered Valium to Womack without her consent.

   At the second trial, in order to prove that Petitioner committed CSC I under the theory that Womack was mentally incapacitated, the prosecutor needed to prove that Womack was under the influence of a drug administered without her consent.  The only such drug in issue was Valium, because both Womack and the attorney for the prosecution expressly represented that Womack had consented to the administration of Phenergan.  In addition, Petitioner was the only person alleged to have administered a drug to Womack without her consent.  Based on the facts presented at the second trial, the jury could only find that Womack was mentally incapacitated after having been administered a drug without her consent if it found that Petitioner administered Valium to Womack.  The first jury expressly acquitted Petitioner of that conduct.  As a consequence, a finding of guilt of CSC I under the theory of mental incapacitation required the second jury to decide an ultimate fact of which Petitioner had been acquitted by the first jury.  The collateral-estoppel rule of *Ashe* therefore barred the admission of evidence in the second trial about Petitioner's delivery of Valium to Womack.

III.    <u>Juror Communications</u>[5]

In his third ground for habeas relief, Petitioner contends that he was denied his Sixth and Fourteenth Amendment rights to an impartial jury. He asserts that the trial court failed to adequately inquire into Juror 19's report of problems among the jurors before declining to excuse her from the jury. He also alleges that the trial court deprived him of his constitutional rights by refusing to grant a mistrial after Juror No. 48 reported that other jurors were intimidating her and failing to follow instructions. Following a twelve-page discussion of the trial record and the law, the court of appeals rejected both claims.

## A.    Juror 19

At the end of the first day of deliberations, the trial recessed for the Fourth of July weekend. The jury resumed deliberations on July 5, 2006. (Tr. 2, vol. X at 2138, docket #18.) At the end of the second day of deliberations, Juror 19 asked to speak with the court, and the court asked her to stay after the jury had been dismissed. (*Id.* at 2152.) The juror advised the court that she was reluctant to raise her concerns in open court. After discussing the problem with counsel and hearing no objection, the court offered the juror the choice of speaking with the judge privately, or speaking on the record in the open courtroom. Juror 19 elected to speak to the judge privately. (*Id.* at 2152-54.) Following a brief off-the-record conversation, the court declined the juror's request to be removed from the jury. The court returned on the record to re-read to Juror 19 the entire instruction governing the duty to deliberate. (*Id.* at 2154-55.) Juror 19 was then excused for the

_____

[5]Should the District Judge accept this Report and Recommendation with respect to the collateral-estoppel question, Petitioner's claims regarding the jury deliberations are moot. If the second trial on the mental incapacitation theory was improper, any error during that trial is irrelevant. Nevertheless, in order to complete the record before the District Court, I will reach Petitioner's third ground for habeas relief.

evening. (*Id.* at 2155-56.) After Jury 19 left the courtroom, defense counsel questioned the propriety of the court's off-the-record conversation with Juror 19 under Michigan Court Rule 6.414(A). (*Id.* at 2157-60.) The court responded that it had discussed the procedure with counsel before talking with the juror and that counsel had consented to the manner of handling the problem. (*Id.*) Defense counsel then stated,

> Again, your Honor, for the record, I'm not necessarily objecting, or even quarrelling [sic] with the court the way it handled it. I'm just simply rereading the court rule, and I would just respectfully request that we just know the nature of the discussion. That's all.

(*Id.* at 2160.) The court advised the parties that the topic raised by Juror 19 involved issues among the jurors. The juror did not provide and the judge did not seek any details about the juror problems. The trial court advised counsel that he had told the juror that jury tensions were not a basis for a juror being excused from the jury. (*Id.* at 2161.) Defense counsel made no further objection and thanked the court. (*Id.*) On the morning of July 6, the trial court made a more complete record about the incident involving Juror 19. (Tr. 2, vol. XI at 2164-66.) Following the court's description of incident, defense counsel again indicated that he only brought the rule to the court's attention because he believed he was required to do so when he discovered that the procedure used was potentially problematic under the rule. (*Id.* at 2166-67.)

On appeal, Petitioner contended that the trial court denied him his right to due process and an impartial jury by failing to conduct the interview with Juror 19 on the record and by failing to investigate Juror 19's claim of jury problems. After quoting the trial record in detail, the Michigan Court of Appeals concluded that defense counsel had either waived or forfeited the issue

by not making a clear contemporaneous objection. It therefore only reviewed the issue for plain error affecting Petitioner's substantial rights. (*Id.*)

When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982). To determine whether a petitioner procedurally defaulted a federal claim in state court, the Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the state court enforced the rule so as to bar the claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim. *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004); *accord Lancaster*, 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). A state law procedural rule is adequate and independent when it was "firmly established and regularly followed" at the time of the asserted procedural default. *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)). In determining whether a state procedural rule was applied to bar a claim, a reviewing court looks to the last reasoned state-court decision disposing of the claim. *See Ylst*, 501 U.S. at 803; *Guilmette v. Howes*, 624 F.3d 286, 291 (6th Cir. 2010).

If a petitioner procedurally defaulted his federal claim in state court, the petitioner must demonstrate either (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 547 U.S. 518, 536 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52. The

miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence. *House*, 547 U.S. at 536. A habeas petitioner asserting a claim of actual innocence must establish that, in light of new evidence, it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt. *Id.* (citing *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

Petitioner's claim is procedurally defaulted, as all three prongs of the procedural-default test are met in this case. First, it is clear that the contemporaneous objection rule was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Kelly*, 378 N.W.2d 365, 369-70 (Mich. 1985); *see also People v. Gonzalez*, 663 N.W.2d 499, 508 (Mich. 2003) (holding that the failure to lodge a contemporaneous objection can result in forfeiture of a claimed error); *People v. Carter*, 612 N.W.2d 144, 149 (Mich. 2000) (recognizing that where a party has acquiesced at trial, the issue is deemed waived, which is defined as the "intentional relinquishment or abandonment of a known right"); *People v. Carines*, 597 N.W.2d 130, 138 (Mich. 1999) (a party who has forfeited a right at trial is limited to review for plain error affecting his substantial rights). A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy." *Lee v. Kemna*, 534 U.S. 362, 385 (2002).

Second, it is equally clear that Petitioner failed to comply with the established procedural rule. As the court of appeals noted, counsel vacillated between expressing agreement with the court's procedure and raising the language of the Michigan Court Rule. Counsel first agreed to the trial court's interview of the juror off the record. After the court had done so and the juror had left the court for the day, only then did counsel point out that Michigan Court Rule 6.414(B) required the judge to make any inquiry of a juror on the record. Counsel did not lodge a precise objection,

acknowledging that his failure to object could have been construed as implied consent. Instead, counsel asked the court to provide the general substance of the discussion. The trial court provided the general substance of the discussion, saying that the juror had told him that there were "issues among the jurors." The trial court had told the juror not to tell him any specifics. The judge then told the juror that she would not be excused from the jury. No further objection was raised by counsel that day. The following morning, the judge made a more complete record, indicating that he had considered his inquiry into the juror's reason for wanting to talk to the judge to be administrative rather than substantive. At the end of the explanation, defense counsel explained why he had not specifically objected but had called the court rule to the court's attention. Counsel then indicated that he "had no problem with the way the court handled it." (MCOA Op. at 13.) The Michigan Court of Appeals reasonably determined that Petitioner violated the contemporaneous objection rule.

Third, the court of appeals squarely invoked Petitioner's failure to comply with the state's independent and adequate state procedural rule as the basis for its decision. *See Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Awkal v. Mitchell*, 613 F.3d 629, 648 (6th Cir. 2010). Even though the court of appeals applied a limited review of the error to determine whether it plainly affected Petitioner's substantial rights, Petitioner's failure to properly object is still considered a procedural default. *See Baze v. Parker*, 371 F.3d 310, 320 (6th Cir. 2004); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989).

Accordingly, review by this Court is barred unless Petitioner can show a basis for excusing his default. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *Murray*, 477 U.S. at 485. *See People v. Fetterley*, 583 N.W.2d 199, 204 (Mich. Ct. App. 1998). Petitioner does not assert that

cause and prejudice excuse his default. Similarly, has he not argued that he is actually innocent based upon new reliable evidence. *House*, 547 U.S. at 536. He therefore demonstrates no basis for excusing his procedural default.

### B.    Juror 48

Petitioner next argues that he was denied an impartial jury when the trial court refused to grant a mistrial based on Juror 48's representations that she was being intimidated and some jurors were not following all instructions.

The record reflects that, during the afternoon of July 6, 2006, Juror 48 sent a message asking to speak with the judge urgently. In her note, Juror 48 indicated that she felt useless as a juror and that the interests of justice would be better served by her replacement with an alternate. (Tr. 2, vol. XI at 2171, docket #19.) Following on-the-record discussions with counsel, the court brought the juror into the courtroom. (*Id.* at 2172-73.) The juror cried and related that other jurors had told her that she belonged in a psych ward. (*Id.* at 2174-77.) She claimed that the problem was that her personality clashed with that of the others, in a way that was unrelated to the deliberations. (*Id.* at 2175.) Defense counsel asked Juror 48 if she felt that she was being intimidated, and she responded, "Yes." (*Id.* at 2176.) She explained that she thought that the criticisms being lodged against her were because she was outspoken. (*Id.* at 2176-77.) Juror 48 was excused from the courtroom, and the court heard argument from counsel. (*Id.* at 2178.) Defense counsel objected to the removal of the juror and moved for a mistrial on the basis of juror misconduct. The court denied the motion. (*Id.* at 2178-80.) The trial judge brought the juror back into the courtroom, advised her that he was reluctant to replace her, and asked her to continue. (*Id.* at 2181-83.) The juror indicated that unspecified other jurors were preventing her from speaking and were ignoring the jury instructions.

She agreed, however, that, despite the circumstances, she could continue to deliberate and could render a verdict based on her own beliefs. (*Id.* at 2184-85.) The court returned Juror 48 to the jury room, stating that he would read an instruction to the entire jury. (*Id.* at 2184.) Defense counsel reiterated his motion for mistrial on the basis of juror misconduct, which was again denied. (*Id.* at 2185-86.) When the jury returned to the courtroom to hear further replay of testimony, the court reinstructed the entire jury on its duty to deliberate and to listen to the other jurors. (*Id.* at 2186-88.)

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . ." U.S. Const. amend. VI. The right to an impartial jury is applicable to the states via the Fourteenth Amendment. *See Turner v. Louisiana*, 379 U.S. 466, 471-72 (1965); *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Further, "due process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." *Morgan v. Illinois*, 504 U.S. 719, 727 (1992) (citations omitted). When a juror's impartiality is called into question, the relevant issue is "'did [the] juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality be believed.'" *Dennis v. Mitchell*, 354 F.3d 511, 520 (6th Cir. 2003) (quoting *Patton v. Yount*, 467 U.S. 1025, 1036 (1984)).

Although the Michigan Court of Appeals did not cite federal law in reaching its determination, it properly evaluated the question of jury impartiality under the federal standard. The court of appeals carefully surveyed the entire trial record and quoted extensively from that record. Emphasizing that the juror had stated that the problems were unrelated to the deliberations and had expressly agreed that she could continue to deliberate and would base her vote on her own decision,

the court of appeals concluded that the trial court had, on proper investigation, reasonably concluded

"that Juror 48 could render a fair and impartial verdict based on her own decision." (MCOA Op. at

19.) The court then found as follows:

> After reviewing the record, we conclude that defendant has not displayed that the circumstances surrounding Juror 48 affected the impartiality of the jury or disqualified her from exercising her own powers of reason and judgment. [*People* v.] *Messenger*, [561 N.W.2d 463, 465 (Mich. Ct. App. 1997)]. Further supporting our conclusion was the fact that, post verdict, Juror 48 represented during jury polling that the jury verdict "is" and "was" her own verdict. For these reasons, the trial court's decision not to grant a mistrial based on Juror 48's situation was not an abuse of discretion.

> Juror 48 also revealed that another unidentified juror might have been deliberately acting in contravention to the jury instructions during deliberations. The trial court took the information seriously, discussed it with counsel, and then decided to immediately reinstruct the entire jury. The trial court's instruction reinforced that all jurors were required to follow the court's instructions and consider the opinions of the other jurors during deliberations. After the trial court reinstructed the jury by reading from CJI2d 3.11, there was never any expression of dissension or intimidation raised by Juror 48, Juror 19, or any other juror during the remainder of the deliberation period. "It is well established that jurors are presumed to follow their instructions." *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998). The record displays that the trial court carefully and reasonably handled the problem. Under the circumstances, the trial court did not abuse its discretion when, after conducting an inquiry into the situation, it elected to instruct the jury consistent with CJI2d 3.11 in lieu of granting a mistrial. Defendant has not shown substantial harm as a result of the situation, thus a mistrial was not warranted. *Fetterley*, *supra* at 545.

(MCOA Op. at 19.)

The conclusion of the court of appeals is entirely consistent with the record evidence

and consistent with the proper constitutional inquiry: whether the juror could decide the case on the

evidence and render an impartial verdict. The court carefully considered the testimony of Juror 48,

who expressly indicated that her differences with the jury were not related to the substance of their

deliberations. Although Juror 48 stated that she felt intimidated and that some jurors may have been

ignoring the jury instructions, she also indicated that she believed that she could continue to deliberate and could act upon her own decision. As the court of appeals determined, the trial court reasonably concluded that, based on Juror 48's representation that she could act on her own judgment and not be intimidated, the problem was best resolved by reinstructing the whole jury about its duty to deliberate. In addition, the court of appeals reasonably found that the instruction given was adequate to cure any potential disregard by fellow jurors of the instructions. The instruction reminded the jury that they had an obligation to ensure that all jurors have a fair chance to be heard, that they consider the opinions of their fellow jurors with an open mind, and that, while they should make every reasonable effort to reach agreement, they should not give up their honest opinions simply because others disagree with them. (Tr. 2, vol. XI at 2187-88.) No evidence exists that the instruction did not serve its intended purpose. No juror subsequently complained of intimidation or other misconduct following the reinstruction. And, when the jury was polled, all jurors, including Juror 48, indicated that the verdict was their own. (Tr. 2, vol. XII at 2202-03.)

In sum, the Michigan Court of Appeals reasonably determined that the jury rendered an impartial verdict, consistent with constitutional requirements.

## Recommended Disposition

For the foregoing reasons, I recommend that Petitioner's first and third habeas grounds be denied. I recommend, however, that the habeas corpus petition be granted on the ground that Petitioner's second trial for CSC I on the theory of mental incapacitation violated the collateral estoppel component of the Double Jeopardy Clause. Because Petitioner is now on parole after having served the minimum portion of his sentence for CSC I, I further recommend that an

unconditional writ be issued immediately releasing him from custody and barring his retrial for CSC I.


Dated:   January 2, 2013                          /s/  Joseph G. Scoville
                                                  United States Magistrate Judge


## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).